178 So.2d 456 (1965)
Angelina C. ACOSTA, Plaintiff-Appellant,
v.
Cullen E. COLE et al., Defendants-Appellees.
No. 6451.
Court of Appeal of Louisiana, First Circuit.
July 1, 1965.
Rehearing Denied September 27, 1965.
Writ Refused November 8, 1965.
Louis D. Curet, of D'Amico & Curet, Baton Rouge, for appellant.
Robert L. Kleinpeter, of Kantrow, Spaht & Kleinpeter, Baton Rouge, George S. Womack, Dennis R. Whalen, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
BAILES, Judge.
The plaintiff brings this action to recover the sum of $11,894.55 allegedly paid by her to the defendants for the purchase of 1205 hours of dancing lessons. Additionally, plaintiff seeks to recover the sum of $98.08 *457 paid to defendants, Cullen E. Cole and Ethel R. Cole, as a deposit on a certain allegedly unconsummated dancing lessons contract. The defendants are Cullen E. Cole and Ethel R. Cole, the original licensees of Arthur Murray Inc., Arthur Murray Inc., the licensor, and Charles L. Miller, Jr., and Jerri A. Miller who purchased the Arthur Murray Studio of Baton Rouge from defendants, Cullen E. Cole and Ethel R. Cole, on or about November 1, 1960. After trial, the lower court awarded judgment in favor of plaintiff and against all defendants in solido in the sum of $98.08, but rejected all other demands of the plaintiff. Plaintiff appealed.
The defendants, Cullen E. Cole and Ethel R. Cole, are before the court as the parties with whom the plaintiff originally contracted for dancing lessons and to whom the consideration was paid therefor; Arthur Murray Inc., is before the court on the allegation of the plaintiff that Arthur Murray Inc., is the principal contracting party with whom the plaintiff had contractual relations through its agent, Cullen E. Cole and Ethel R. Cole; and finally Charles L. Miller, Jr., and Jerri A. Miller are before the court and parties to this litigation on the basis of being the purchasers of the Arthur Murray Studio of Baton Rouge and who assumed the obligations of the contracts entered into by the plaintiff with the other defendants herein.
It was stipulated between the parties that the plaintiff and defendants Cole entered into contracts whereby plaintiff purchased dancing lessons on the following stated dates, numbers of lessons and for the stated prices, to-wit:

 Number of Hour
Date Lessons Prices
10/31/58 5 $ 14.50
11/ 8/58 104 1,112.80
11/19/58 315 3,638.25
11/21/58 331 2,981.25
1/ 9/59 450 4,147.55
 _____ ___________
 1205 $ 11,894.55

It was also stipulated that the plaintiff had paid to the Arthur Murray Studio the sum of $98.08; that the plaintiff "has received a total of 140½ hours of instruction covering the period from 10-31-58 through March 7, 1959, thus leaving a balance of 1064½ hours presently reflected on the books of the Arthur Murray Studios of Baton Rouge, which are paid for but unused, not considering the check for $98.08 dated March 6, 1959 and the lessons represented by said payment if any."
"The record reflects that defendants, Charles L. Miller, Jr., and Jerri A. Miller, assume all liability of the defendants, Coles, arising out of this obligation."
From our perusal of the record, we find that the plaintiff has correctly stated in her brief, the grounds on which she seeks the return of the amount claimed in this litigation. We quote from the plaintiff's brief:
"1. That the alleged contracts for which said sum was paid are null, void and of no effect because plaintiff did not give her voluntary consent, said lack of consent being based upon her mental and physical condition, and due to the coercive sales techniques used by defendants, all of which are more particularly described in paragraph 3 (c) of plaintiff's first supplemental and amended petition.
"2. Plaintiff contends further that the alleged contracts are null, void and unenforceable for the additional reason that they are uncertain, indefinite and incomplete in that they fail to designate a prescribed time limit within [which] these lessons are to be scheduled, although there is a blank especially reserved on the contract form for that purpose * * *.
"3. In the alternative, should the court find that the contracts in question are not null and void for want of consent, plaintiff alleges that she *458 is unable to continue taking dancing lessons due to poor health, and that he inability to take further instruction is an implied resolutory condition, and as such entitled plaintiff to a rescission of the contract and to a restitution of all the money she has paid the defendants for which she has received no instructions. * * *
"4. Plaintiff contends further, in the alternative, that the contracts are contrary to public policy, (contra bonos mores), and that to uphold said contracts would result in the unjust enrichment of defendants at the expense of plaintiff * *.
"5. Plaintiff contends further, in the alternative, that the contracts should be set aside for failure of consideration * * *.
"Plaintiff seeks the return of $98.08 on the grounds that it was a deposit on a course of additional instruction on terms to be arranged, but the terms were never arranged and there was not a meeting of the minds relative thereto."
After trial on the merits, the trial judge rendered written reasons for judgment in which he stated, in part, the following:
"* * *
"The Court has evaluated the evidence most carefully and is unable to hold that the contracts signed by plaintiff are null and void for want of legal consent.
"Article 1779 of the Louisiana Civil Code provides:
"`Four requisites are necessary to the validity of a contract:
"`1. Parties legally capable of contracting.
"`2. Their consent legally given.
"`3. A certain object, which forms the matter of agreement.
"`4. A lawful purpose.'
"Consent is defined in Article 1819 as follows:
"`Consent being the concurrence of intention in two or more persons, with regard to a matter understood by all, reciprocally communicated, and resulting in each party from a free and deliberate exercise of the will, it follows that there is no consent, not only where the intent has not been mutually communicated or implied, as is provided in the preceding paragraph, but also where it has been produced by
Error;
Fraud;
Violence;
Threats.'
"* * *
"If plaintiff were to prevail, the Court would be establishing a precedent of declaring null and void every sale where high pressure techniques are applied to persons who are not mental defectives or weak minded but do have emotional problems that made them unusually susceptible to the salesman's product.
"Again, the wisdom or folly of such contracts are not the concern of the courts, and plaintiff has cited no law of our state affording such persons protection.
"Plaintiff next contends that the dance contracts of the defendants are contra bonos mores (contrary to moral conduct) or to public order. However, whether a contract is contrary to good morals or to public order depends upon its cause or consideration, and here the cause or the consideration of the contract was dancing lessons. Nothing in our law, jurisprudence or in the testimony indicates that dancing lessons are contrary to public policy or morals.
"With regard to plaintiff's argument that Mrs. Acosta was physically and *459 emotionally unable to take dancing lessons and that the contract should be resolved, admitting arguendo that she is so disabled, there can be no such resolutory condition in a contract which provides expressly against the same. Here the agreement provided that Mrs. Acosta:
"`* * * shall not be relieved of my obligation to pay said tuition herein agreed upon, and that no deduction allowed or refunds for tuition paid and due under this agreement shall be made by reason of my absence or withdrawal. I understand that no refunds will be made under the terms of this contract.'
"Thus defendant has closed the door on this argument with a positive contractual provision which is the law of the parties.
"The Court has further considered plaintiff's argument of failure of consideration and lack of certainty and definiteness in the contract and finds them without merit.
"For the above and foregoing reasons, judgment will be signed in favor of the plaintiff in the sum of $98.08, being the amount of the deposit paid by plaintiff to defendant and referred to hereinabove, which the Court orders returned together with legal interest thereon from date of judicial demand until paid, and judgment will be signed in favor of Cullen E. Cole and Ethel R. McKee Cole over and against Charles L. Miller, Jr., and Jerri A. Miller in the full sum of the amount of the judgment herein together with all costs and attorneys' fees. The Court further, in its discretion, has assessed all the costs herein to the defendants and otherwise rejects all of the remaining demands of the plaintiff."
In her brief, the plaintiff has set up twelve specifications of error of the trial court, however, suffice it to say that we are not impressed with any of these specifications except the following:
"7. The court erred in failing to recognize, and properly apply the law relative to resolutory conditions, and particularly the implied condition that performance and ability to perform is presumed and implied in personal services contract, and if a person is unable to perform due to physical and/or emotional disability that this should relieve him of any and all obligations under the contract."
We find that the trial court did not pass on the probative value of the evidence introduced by the plaintiff for the purpose of showing physical and mental inability to perform her obligations under the contract, that, of taking the dancing lessons contracted for with the defendants. As shown supra, the trial court ruled that the quoted condition of the contract prohibited any refunds of money paid under the contracts.
On the question of physical and mental disability of the plaintiff, we find the proof clear and convincing that she is, in fact, unable to continue to receive dancing instructions. The plaintiff offered the testimony of four doctors, these being a gynecologist, an internist, and two psychiatrists; however, only one psychiatrist, Dr. Sparkman Wyatt, testified as to any mental illness affecting performance of this contract.
Dr. Edward G. Cailleteau, physician and gynecologist, who has treated the plaintiff since 1948, testified that plaintiff was suffering from inactive tuberculosis, hypertension and emotional depression. Pertinent portions of his testimony follow:
(R. 432-433)
"A. Well, I would say that she would probably be influenced more easily than the average patient because people who are rather emotionally unstable sometimes don't even believe what the doctor *460 is talking about and go to two or three, take a ride on a train and go see another one and they wind up letting someone rub their back or something. I don't believe you can say that because this person is depressed that he is going to naturally be able to be influenced beyond thinking about the matter. I would say that she is definitely very unstable. I say that with apology to the lady, and it might be said of a lot of us, I presume, on occasion, but she medically is very unstable, very emotional and I worried about that particular item a great deal when I sent her to Dr. Faust.
"Q. Dr. Cailleteau, did you discuss with Mrs. Acosta the continuation of her dancing lessons or the taking of dancing lessons?
"A. No, she told me about it, and I thought it a rather odd situation, but the world is full of them, and I quit worrying about it.
"Q. Would you recommend as a physician treating Mrs. Acosta, would you recommend that she continue to take dancing lessons?
"A. Oh, no, I think from the physical standpoint alone that it would be very foolish, but we see patients all the time that do things very foolish.
"Q. What effect do you think or what risks might she run
"A. Oh, she could break down in tuberculosis. * * * She could certainly worsen her hypertension, which has been 190 over 110, and it is pretty good reading to be taking exercise with and we had that recorded on a number of occasions. That is why we had Dr. Faust see the lady."
(R. 437)
"A. Well, I have some reports that run back tobefore 1958, yes, and she was an arrested case of tuberculosis, and the one letter is addressed August 21, 1956, and another one is 1955, and they felt as though she had an arrested case, inactive as much as one can determine."
Dr. Jacob Faust, physician and internist, to whom plaintiff was referred by Dr. Cailleteau testified, in part, that:
(R. 440)
"A. She was originally referred to me with high blood pressure. She gave a past history of arrested pulmonary tuberculosis, and since that time, I have treated her for her complaints as they have come up."
(R. 456, 457 and 458)
"Q. Doctor, from the time that you started treating Mrs. Acosta in February of 1957 through the period of March of 1959, was there any change or any substantial change in her to the extent that she was free of those symptoms that you describe, namely, depression and emotional instability?
"A. No, her symptoms actually were increasing all this time. I think that her mental state was worse at the end of this period than it was at the beginning.
"Q. Now, was there any period during this time from February of 1957 through March of 1959 that you would say she was not easily susceptible to influence?
*461 "A. I think she was equally sick all the time. She would have periods of moderate improvement, but I don't think she was ever well during that time.
"Q. Now, doctor, if there wereI will ask you this question. Did you discuss with Mrs. Acosta her dancing program or the fact that she had contracted for or had negotiated for dancing lessons?
"A. That was the essential burden of the visits during most of 1959, 1960 and 1961. I felt that that was the particular situation outside of her, not in her own personality, but the outside pressure that was particularly giving her trouble.
"Q. Now, did you feel that her connection with the Arthur Murray Studio had any effect upon her emotional well being?
"A. Yes, I thought it made her worse.
"Q. Could you telldid you examine her at any time while she was taking dancing lessons?
"A. No, do you mean
"Q. Not physically, but during the same period of time when she was actually going up to the Arthur Murray Studio?
"A. I am sure I did. Do you have those dates?
"Q. Any time between October, 1958, and March, 1959?
"A. Yes, well, actually I saw her on October, 1958, and I saw her again in March, 1959."
(R. 474)
"Q. Doctor, knowing Mrs. Acosta's condition as her history, would you recommend at this time she continue taking dancing lessons at the Arthur Murray Studio?
"A. No, sir.
"Q. Why not?
"A. I feel that she will have a complete breakdown if she continues.
"Q. Can you explain and elaborate what you mean by that, doctor, or what the basis for that statement is?
"A. I feel that she has been having a continuing, worsening depression, which in the beginning she was able to function moderately well at a reduced level. I think she is getting now to where she is not functioning at all. I can envision this situation proceeding to where she becomes much, much worse mentally if it continues."
Dr. Sparkman Wyatt, a psychiatrist, testified that:
"A. * * * I think she needs treatment and it isthere is a theory, not a theory, it is a fact that there are times when getting out among people and engaging in exercise and fun are beneficial to people. Certainly those things are beneficial to healthy people, but when a person is depressed to the extent which I think Mrs. Acosta is, such things are not only not beneficial, but they are damaging, dangerous, a waste of money and a waste of time. She needs treatment. She is sick. Now dancing and music and other forms of recreation are used in mental hospitals with the treatment of the mentally ill. However, they are integrated by professional people into the course of therapy and not offered up as a solution in itself to a person's mental difficulties. This *462 is the same line as why very few psychiatrists nowadays send people on vacations to get away from it if a person is sick. They don't get away from it. They carry it with them. They waste their money. They bring the problem back with them and sometimes much worse then it was to begin with and without the money to pay for treatment."
In addition to the three expert medical witnesses, the plaintiff testified to her own inability to physically and emotionally withstand the exertions of the dancing lessons, and introduced the testimony of six lay witnesses who have known her for a number of years and who testified that plaintiff was physically and mentally ill. Their testimony, in the main, corroborated the expert medical opinion.
We find that the plaintiff has clearly demonstrated her physical and mental illness and inability to perform her part of the contract and to further pursue the dancing instructions contracted for with the defendants.
We find it worthy to note that the record is barren of any medical testimony introduced by defendants to rebut or refute the medical evidence of physical and mental disability of the plaintiff.
In the case of Richardson v. Cole (1965 La.App. 2nd Cir.) 173 So.2d 336, the court had before it a situation which was almost identical to the one presented to us in the instant case. In that case the appeal was taken from a ruling of the trial court which sustained a peremptory exception of no cause or right of action. Therein the court, on page 337, stated:
"Defendant's exception is predicated upon the argument that the contracts sued upon provide that no refunds will be made; that the agreements are legal, enforceable, entitled to the interpretation and effect of law as between the parties, and are not subject to revocation.
"We think the issue presented is delineated by the interpretations placed by the parties upon the nature and effect of the contractual agreements. Counsel for defendant considers the present action to be an effort to procure a partial refund of the consideration paid by plaintiff and relies upon the specific prohibition against refunds incorporated in the contracts as a bar to plaintiff's recovery. On the other hand, counsel for plaintiff interpret the contracts as agreements for the rendition of personal services and predicate this action for rescission of the contracts upon the plaintiff's physical inability to receive the services provided.
"Conceding the validity of the principles that legal agreements have the effect of law as between the parties thereto, and the courts cannot concern themselves with the wisdom or folly of the contractual provisions, we are, nevertheless, of the opinion that the contracts here involved are personal and must be so interpreted both as to the obligor and obligee. Under the specific provisions of LSA-C.C. Article 2000 the obligation on the part of defendant must be construed to be purely personal since she undertook to perform specific services that required her personal skill and attention.
"Similarly, under the plain wording of LSA-C.C. Article 2001, the obligation is personal as to plaintiff because of its nature which was designed for her personal gratification.
"Although the codal articles above noted particularly refer to the inability to perform by reason of death, there is no reason to consider that they should not be applied to cases involving the total and permanent disability of either of the parties to perform the obligations imposed by the contract.

*463 "It is clear, upon the face of plaintiff's pleadings, that she has paid for services which she can no longer receive due to no fault of her own. It follows that, in addition to the legal principles above noted, equitable considerations would amply justify the rescission of the contracts."
We quote herein in full the above quoted articles of the Civil Code. LSA-C.C. Article 2000 provides:
"The obligation shall be presumed to be personal on the part of the obligor, whenever, in a contract to do, he undertakes to perform any thing that requires his personal skill or attention; in this case, if that, which was to be done, was not solely and exclusively for the use or gratification of the obligee, the obligation, although personal as to the obligor, will be heritable against the heirs of the obligee for the equivalent to be paid or given for that which was to be done."
And, LSA-C.C. Article 2001 provides:
"The obligation shall be presumed to be personal as to the obligee, in a contract to do or to give, when that which was to be done or given, was exclusively for the personal gratification of the obligee, and could produce no benefit to his heirs."
Thus, we see that the contracts between the plaintiff and defendant are reciprocally personal.
Restitution is provided for under the provisions of Article 2003 which states:
"* * * [I]f the obligation be purely personal as to the obligee who dies before performance, his heirs may recover from the obligor the value of any equivalent he may have received."
The words "dies before performance" as contained in the above article are analogous to "becoming disabled before performance" and thus under the provisions thereof, the plaintiff is entitled to recover the unearned portion of consideration of the contract.
In Civil Law Translations, Vol. 1, Aubry & Rau, Droit Civil Francais (Vol. IV6th Ed.) Obligations, at p. 351, VI. Dissolution of Contracts, § 348, we find this commentation:
"* * *
"Finally, contracts are resolved by the occurrence of an obstacle which renders impossible the performance of the engagement contracted by one of the parties which this engagement consists in an obligation to do or an obligation to deliver whose object is the transfer of a personal right of enjoyment. * * *"
In 17A C.J.S. Contracts § 465, p. 623, we find the rule affecting resolution of a personal contract expressed in the following language:
"* * *
"Contracts to perform personal acts are considered as made on the implied condition that the party shall be alive and capable of performing the contract, so that death or disability, including sickness, will operate as a discharge, termination of the contract, or excuse for nonperformance; contracts resting on the skill, taste, or science of a party, that is, those contracts wherein personal performance by the promisor is of the essence and the duty imposed cannot be done as well by others as by the promisor himself, are personal and do not survive his death. Each case must be decided on its peculiar facts, including a consideration of the language of the contract in the light of the surrounding circumstances; and contract, regardless of its subject matter, may be made personal so as to be brought within the operation of the rule. * * *"
We have here the plaintiff and defendants who entered into a perfect synallagmatic contract, a contract in which *464 each personally bound himself to perform a certain act for the benefit of the other. There is implied in such a contract the resolutory condition that in the event either is rendered incapable of performing the conditions imposed upon him for the benefit of the other, the contract will be dissolved and the parties restored to the positions formerly occupied by each, as perfectly as possible. Thus, translated into the facts before us, this means that the plaintiff obligated herself to receive from the defendants 1205 hours of dancing lessons and to pay the defendants therefor the total sum of $11,894.55, and the defendants obligated themselves to provide for and furnish to the plaintiff the contracted for 1205 hours of dancing lessons. Both conditions or the mutual conditions of the contract required the personal performance of the conditions by both parties thereto. Therefore, in the event of the fulfillment or the occurrence of the resolutory condition, the inability of the plaintiff to receive the dancing lessons, the plaintiff is entitled to be restored to the condition that existed prior to the confection of the contract, to be relieved of the obligation to receive the dancing lessons and to a refund of the unearned portion of the contract price thereof.
Accordingly, the plaintiff is entitled to judgment dissolving the contract she entered into with defendants and to a refund of the unearned portion of the contracts. It was stipulated that she had used 140½ hours of dancing lessons. These 140½ hours of instruction will be deducted from the first 140½ hours contracted for by her. The defendants are entitled to retain the price plaintiff paid for the first 140½hours of instruction, which means that the contract entered into on October 31, 1958 for five hours of instruction at a cost of $14.50, and the contract entered into on November 8, 1958 for 104 hours at a cost of $1,112.80 will be considered as completed contracts. This leaves a total of 32½ hours of instruction to be paid for from the contract entered into on November 19, 1958 wherein 315 hours of instruction were contracted for at a cost of $3,638.25, or an hourly instruction rate of $11.55. Thirty-two and one-half hours of instruction at $11.55 per hour equals $375.38. The plaintiff is entitled to a refund of the total amount of the contracts entered into on November 21, 1958 for $2,981.45 and January 9, 1959 for $4,147.55, plus the contract entered into on November 19, 1958 for $3,638.25, less the sum of $375.38, or the sum of $10,328.87.
For the foregoing reasons the judgment appealed from is amended and increased to the sum of Ten Thousand Four Hundred Twenty-six & 95/100 ($10,426.95) Dollars, together with legal interest thereon from date of judicial demand until paid, and in all other respects the judgment appealed from is affirmed. Defendants to pay all court costs.
Amended and affirmed.