411 So.2d 473 (1982)
Curley Everton VICTORIAN, Plaintiff & Appellant,
v.
Lucille Lemelle VICTORIAN, et al., Defendants & Appellees.
No. 8581.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1982.
*474 Ardoin & Daigle, J. Winston Ardoin, Eunice, for plaintiff & appellant.
Donald Soileau, Mamou, for defendants & appellees.
Before CULPEPPER, FORET and CUTRER, JJ.
CULPEPPER, Judge.
This is a suit to annul a conveyance of 26 acres of land. The plaintiff, Curley Everton Victorian, alleges that on April 14, 1975 he executed an instrument entitled "CASH SALE DEED" whereby he conveyed to his younger brother, Clargia Victorian, 26 acres of land in Evangeline Parish for a consideration stated as follows: "This sale is made for the consideration of the sum of (no money paid) as considerations. Vendee agrees to take care of Vendor's person and furnish him a place to stay until Vendor's death." Plaintiff alleges that he is still alive but that Clargia died on February 3, 1980, thereby making it impossible for Clargia to take care of plaintiff's person until plaintiff's death, and that therefore the condition upon which the transfer of title was based cannot occur and the conveyance is null and void. The defendants are respectively the widow and two children of Clargia Victorian.
Defendants filed an answer denying that the sale is void for lack of consideration, and affirmatively alleging that the sale was supported by sufficient consideration consisting of caring for the plaintiff for many years. In the alternative, and in the event the court should find plaintiff is entitled to some relief from the sale, the widow of the deceased filed a reconventional demand against the plaintiff for her services in furnishing him with care, housing, food, cooking, washing, etc. for many years, even prior to 1965, which services she alleges are valued at $50 per day.
The trial judge held that the sale was actually an onerous donation, which required that Clargia or his wife or heirs care for plaintiff until his death, but that since plaintiff moved out of the widow's house immediately after Clargia's death and refused the offer of the widow to care for plaintiff, the obligation of the widow and heirs to care for the plaintiff was fulfilled, and the obligation was satisfied. From a judgment rejecting his demands to annul the sale, plaintiff appeals.
The substantial issues presented on appeal are: (1) Was the conveyance of the 26 acres an onerous and/or a remunerative donation? (2) If it was an onerous donation in whole or in part, was the obligation of Clargia Victorian strictly personal as to the obligor and was it heritable by the obligor's heirs? (3) If the conveyance of the 26 acres was both a remunerative and an onerous donation, does the evidence show sufficient consideration was received by the vendor?

FACTS
The facts show that the plaintiff, Curley Everton Victorian, is now 94 years of age. He was 88 at the time of the 1975 conveyance. For many years Curley lived in the same home with his younger brother, Clargia Victorian, and Clargia's wife, Lucille. Plaintiff testified he had lived with his *475 brother for about 40 years. Lucille testified plaintiff had lived with them since 1953. She explained that before 1953 she and her husband lived in another house and rented the farm from plaintiff to whom they paid rent of one-third of the crop. Lucille testified that even before plaintiff moved into the same home with them in 1953, she had cooked and washed since 1943 for plaintiff, who then lived in a nearby house.
After plaintiff moved into the home with Clargia and Lucille in about 1953, Lucille cooked, washed clothes, cleaned house and generally took care of plaintiff. In 1965, Clargia became crippled and could no longer work the farm. They paid no rent to Curley after 1965, but Lucille testified she and Clargia continued to take care of him. According to Lucille's testimony, the three of them pooled their meager incomes, Curley's welfare check of approximately $100 per month and Lucille's and Clargia's checks of about $70 per month, and they paid for food, clothes, utilities and medicine, and had a small amount of cash left over for each at the end of each month.
In 1975 Curley was hospitalized in Opelousas for surgery. He testified that on his discharge from the hospital he was faced with the necessity of having to go to the "Old Folks Home", but that Clargia came to the hospital and took him back home and agreed to take care of him for the rest of his life, if Curley would convey to Clargia the 26 acres on which the home was located. Curley testified he agreed to "will" the 26 acres to Clargia, it being his understanding that title would not pass until Curley's death. On April 14, 1975, Curley executed the "Cash Sale Deed" conveying to Clargia Victorian, husband of Lucille Lemelle, the 26 acres in question for the consideration stated to be: "No money paid. As consideration Vendee agrees to take care of Vendor's person and furnish him a place to stay until Vendor's death."
The evidence shows that after the execution of the 1975 conveyance plaintiff continued to live with Clargia and Lucille in the house on the 26 acres until Clargia died on February 3, 1980. Lucille testified that after Curley, then 88 years of age, returned from the hospital in 1975, he required more care. She says he was "like a baby", who had to be fed, dressed, bathed, given medicine, etc. He was badly crippled with arthritis, in addition to general infirmities of old age.
Three days after Clargia died on February 3, 1980, plaintiff moved out of the house. He testified that after Clargia died Lucille pushed him and hit him on the arms, so he left. Lucille denied that there was any disagreement or that she ever mistreated plaintiff in any way. The trial judge found there was only a minor misunderstanding, at most, and that it was not sufficient for plaintiff to refuse Lucille's continued care. Lucille went to see an attorney for advice about the status of the title to the 26 acres. On March 11, 1980, this attorney wrote a letter to plaintiff advising that Lucille was ready, willing and able to take care of him for the remainder of his life. Nevertheless, plaintiff did not return to Lucille's home.
In April of 1980, Lucille sold the 26 acres for a consideration of about $1,100 per acre, a total of about $28,000. She testified she used the proceeds of the sale to pay Clargia's funeral expenses and other debts. At the trial in January of 1981, Lucille testified she was living in a rented house where she had ample room to take care of Curley, and that she was still ready, willing and able to do so.

ONEROUS AND/OR REMUNERATIVE DONATION
The first issue is whether the conveyance was an onerous and/or a remunerative donation. The following articles of our Civil Code are applicable:
"Art. 1523. Gratuitous, onerous and remunerative donations; definitions. There are three kinds of donations inter vivos:

The donation purely gratuitous, or that which is made without condition and merely from liberality;

*476 The onerous donation, or that which is burdened with charges imposed on the donee;
The remunerative donation, or that the object of which is to recompense for services rendered.
Art. 1524. Onerous donation. The onerous donation is not a real donation, if the value of the object given does not manifestly exceed that of the charges imposed on the donee.
Art. 1525. Remunerative donation. The remunerative donation is not a real donation, if the value of the services to be recompensed thereby being appreciated in money, should be little inferior to that of the gift.
Art. 1526. Onerous and remunerative donations, when rules applicable. In consequence, the rules peculiar to donations inter vivos do not apply to onerous and remunerative donations, except when the value of the object given exceeds by one-half that of the charges or of the services."
The trial judge reasoned that the donation was onerous, not remunerative, because the instrument, in describing the consideration, states only that the Vendee agrees to take care of Vendor until Vendor's death. The instrument does not expressly state that part of the consideration was to recompense the Vendee for services rendered in caring for the Vendor before the execution of the conveyance. We disagree with this construction of the transaction. It is our view that the donation was both remunerative and onerous.
Since this is a remunerative or an onerous donation, not a purely gratuitous donation, the rules peculiar to donations inter vivos do not apply, unless the value of the object given exceeds by one-half that of the services rendered. LSA-C.C. Article 1526. Although there is no direct evidence as to the exact value of the services rendered to plaintiff by Clargia and his wife, the trial judge held, and the record clearly shows, these services exceeded by one-half the value of the land conveyed. Thus, the rules peculiar to donations inter vivos do not apply. The applicable rules are those pertaining to contracts in general and to sales in particular.
LSA-C.C.P. Article 2276 states the general rule that parol evidence shall not be admitted to vary the terms of a written instrument. However, a well established jurisprudential exception to this rule is that in contracts of sale parol evidence is admissible to show the true consideration, although completely different than that recited in the instrument. Citizens Bank & Trust Company v. Willis, 183 La. 127, 162 So. 822 (1935); Warden v. Porter, 228 La. 27, 81 So.2d 707 (1955); Ryals v. Ryals, 199 So. 481 (La.App.2d Cir. 1940); Bash v. Sims, 210 So.2d 180 (La.App.2d Cir. 1968); Quinn v. Stafford, 357 So.2d 628 (La.App. 1st Cir. 1978).
Applying this rule to the present case, the parol evidence, which was admitted without objection, may be considered to show that the true consideration was not only the value of the services rendered by the donee to the donor after the 1975 conveyance, but also the value of the services rendered by the donee to the donor before the 1975 instrument. As to those services rendered before the execution of the 1975 instrument, the donation was remunerative, to recompense the donee. As to those services rendered after the 1975 instrument, the donation was onerous, in the sense that it required the donee to take care of the donor for the rest of the donor's life.
The next issue is whether the onerous obligation of the donee, to take care of the donor for the remainder of donor's life after 1975, was strictly personal as to the donee-obligor. The trial judge held the donee's obligation to care for the donor was not strictly personal as to the donee-obligor and was heritable by the donee-obligor's heirs. On appeal, plaintiff argues persuasively that the obligation was strictly personal, both as to the obligee and as to the obligor, and that it was not heritable. We agree.
The applicable statutory law is set forth in the following articles of our Civil Code:

*477 "Art. 1997. Definition of strictly personal, heritable, and real obligations.
An obligation is strictly personal, when none but the obligee can enforce the performance, or when it can be enforced only against the obligor.
It is heritable when the heirs and assigns of the one party may enforce the performance against the heirs of the other.
It is real when it is attached to immovable property, and passes with it into whatever hands it may come, without making the third possessor personally responsible."
"Art. 1998. Personal and heritable character of obligations. An obligation may be personal as to the obligee, and heritable as to the obligor, and it may in like manner be heritable as to the obligee, and personal as to the obligor."
"Art. 1999. Presumption of heritability of obligations. Every obligation shall be deemed to be heritable as to both parties, unless the contrary be specially expressed, or necessarily implied from the nature of the contract."
"Art. 2000. Obligations personal on part of obligor. The obligation shall be presumed to be personal on the part of the obligor, whenever, in a contract to do, he undertakes to perform any thing that requires his personal skill or attention; in this case, if that, which was to be done, was not solely and exclusively for the use or gratification of the obligee, the obligation, although personal as to the obligor, will be heritable against the heirs of the obligee for the equivalent to be paid or given for that which was to be done."
"Art. 2001. Obligations personal to obligee. The obligation shall be presumed to be personal as to the obligee, in a contract to do or to give, when that which was to be done or given, was exclusively for the personal gratification of the obligee, and could produce no benefit to his heirs."
"Art. 2002. Liability of heirs in case of death of obligor before performance of personal obligation. In case of obligations purely personal as to the obligor, if he has received an equivalent that can be appreciated in money as a consideration, but dies before performance of his obligation, his heirs may be obliged to restore it or its value."
"Art. 2003. Rights of heirs in case of death of personal obligee before performance. In like manner, if the obligation be purely personal as to the obligee who dies before performance, his heirs may recover from the obligor the value of any equivalent he may have received."
In support of his contention that Clargia's obligation to care for Curley was strictly personal as to the obligor, plaintiff calls attention to his testimony that he intended that only his brother, Clargia, would care for him until his death. He says he did not intend that Clargia's wife or daughters could care for him if Clargia died. Plaintiff argues that since Clargia died before he could perform his personal obligation, the contract is terminated and is a nullity for lack of cause. Plaintiff cites several cases for the rule that a contract may be dissolved for nonperformance of its conditions or failure of cause or consideration. Moore v. Sucher, 234 La. 1068, 102 So.2d 459 (1958) and the Code articles and cases cited therein. Plaintiff also cites Richardson v. Cole, 173 So.2d 336 (La.App.2d Cir. 1965) and Acosta v. Cole, 178 So.2d 456 (La.App. 1st Cir. 1965), writ refused 248 La. 432, 433, 179 So.2d 273, 274, each of which involved a contract under which the plaintiff paid in advance for a long series of dance lessons and then became too ill to take the lessons and sued for dissolution of the contract. The court held the obligation to give the dance lessons was personal to the plaintiff-obligee, and that under LSA-C.C. Article 2003, which provides that an obligation personal to the obligee terminates on the death of the obligee, the inability to take the dance lessons was the same as if plaintiff died, resulting in the termination of the contract and allowing the plaintiff to recover for the unearned lessons.
Under Article 2001, quoted above, it is clear that the obligation to care for the donor until his death was strictly personal *478 to the donor, since it was exclusively for the donor's benefit and could produce no benefit to his heirs. There is a question as to whether this obligation was also personal as to the donee-obligor and whether it was heritable as to the obligor. The trial judge held that the obligation to take care of the donor for the rest of his life was not personal as to the donee and was heritable by his heirs. We do not agree with this analysis.
On the question of whether the obligation was strictly personal as to the obligor, Article 2000, quoted above, provides that an obligation is presumed to be personal on the part of the obligor in a contract to do that requires his personal attention. Plaintiff testified he intended that he be cared for only by his brother, Clargia, and not by Clargia's widow or heirs. This testimony is corroborated by the fact that three days after Clargia died Curley moved out of the home. Although the evidence shows that Clargia's wife did all of the cooking, washing, house cleaning and tending to the personal needs of the plaintiff, these services could have been performed by another person. Plaintiff wanted more from his brother than the performance of these services. He wanted his brother's personal care and attention in his brother's home. Choosing a person to care for you for the rest of your life can be a highly personal matter, as it was in this case. We think the obligation to care for Curley and furnish him a place to live for the rest of his life, was strictly personal as to Clargia.
Moreover, we conclude the obligation was not heritable as to Clargia's heirs. Article 1999, quoted above, states the general rule that obligations are deemed to be heritable as to both parties, unless the contrary be specially expressed or necessarily implied from the nature of the contract. Article 2000, quoted above, provides that where an obligation to do is strictly personal as to the obligor "if that, which was to be done, was not solely and exclusively for the use or gratification of the obligee, the obligation, although personal as to the obligor, will be heritable against the heirs of the obligee for the equivalent to be paid or given for that which was to be done." This last quoted portion of Article 2000 does not apply in the present case, since that which was to be done was solely for the gratification of the obligee, who is still alive. Under the facts of this case, we find it was "necessarily implied from the nature of the contract", Article 1999, that the obligation was not heritable as to the obligor.
Having decided that the obligation to take care of the donor for the rest of his life was strictly personal and not heritable as to both the obligee and the obligor, the next issue is the effect of the death of the obligor before completion of performance of his obligation. LSA-C.C. Articles 2002 and 2003 provide as follows:
"Art. 2002. Death of obligor before performance of personal obligation, liability of heirs
Art. 2002. In case of obligations purely personal as to the obligor, if he have received an equivalent that can be appreciated in money as a consideration, but dies before performance of his obligation, his heirs may be obliged to restore it or its value.
 History and Text of Former Codes
RCC 1870. Art. 2002:
(Errors in English translation (Projet, p. 270. Addition adopt
of French text-the word "obligor" ed; no comment.)
should be "obligee" and
the words "his obligation" should CC 1808: No corresponding article.
be "the obligation.")
 CN 1804: No corresponding article.
CC 1825, Art. 1997: Same as
above."
"Art. 2003. Death of personal obligee before performance, rights of heirs
Art. 2003. In like manner, if the obligation be purely personal as to the obligee who dies before performance, his heirs may recover from the obligor the value of any equivalent he may have received.
 History and Text of Former Codes
CC 1825, Art. 1998: Same as CC 1808: No corresponding article.
above.
(Projet. p. 270. Addition CN 1804: No corresponding article.
adopted; no comment.)"
We recognize the notation under LSA-C.C. Article 2002 that there are errors in the English translation of the French text, i.e., that the word "obligor" should be "obligee" *479 and the words "his obligation" should be "the obligation". However, regardless of whether these are "errors" in translation, we find that Article 2002, as first adopted in 1825 and remaining unchanged until today, can be construed literally, as explained below.
Article 2002 as written could be applied easily to a situation where the obligor dies before performance of any portion of his personal obligation. In that situation, the obligor's heirs would be obliged to restore to the obligee all consideration or its value which the obligor had received from the obligee. Thus, in the present case, if Clargia, the obligor, had not performed any services in taking care of Curley, Article 2002 would appear to require that Clargia's widow and heirs return to Curley the 26 acres.
The present case is complicated by the fact that Clargia, the obligor, did not die until after partial performance by him. Clargia, the obligor, took care of Curley, the obligee, for approximately six years before Clargia died. The above quoted Articles of the Civil Code do not expressly answer the question of the rights and obligations of the heirs of the obligor who dies after partial performance of an obligation personal as to the obligor. However, Alain A. Levasseur, Precis In Conventional Obligations, A Civil Code Analysis, at page 79, gives the following helpful discussion in stating general principles applicable in case of fortuitous nonperformance:
"(a) Principle: "Res perit debitori".
In the situation where one obligation can no longer be performed because of fortuitous event, the other obligation will also become extinct. The release of one party leads to the release of the other. This solution can be explained by the theory of cause. The risks are, therefore, in a sense, for the party whose performance has become impossible because of fortuitous event.

Example: the patron of a theater is entitled to the reimbursement of his ticket if the theater cannot put on the show as a result of the death of an actor.
This principle (not expressly stated in the code) can be induced from a series of code articles: example: LCC 2697; 2759; 2760; 2879.
This principle is applicable to all synallagmatic contracts whether they create obligations to do or not to do or obligations to give a thing in kind not yet singled out by the time the fortuitous event occurs. In addition, the obligation must be one of result [if the obligation is one of means, either the obligor has been diligent and there has been performance or he has made a mistake and he will be held liable].
Where there is impossibility of performance by the obligor, the contract is extinguished of right without intervention of the court. Should the court be called upon, it can only recognize the failure of performance of one obligation and the correlative extinction of the other obligation: example: LCC 2697, first sentence.
Where the fortuitous event has caused a partial impossibility of performance, the court will decide whether the dissolution of the contract should be total or partial only; where the dissolution is partial only, the creditor will have to perform part of his own obligation: example: LCC 2697, second sentence. As a result, the obligations of the parties are restructured, re-balanced."
Particularly applicable to the present case is the last paragraph of the above quotation. The fortuitous event, Clargia's death, caused only a partial impossibility of performance. In this situation, the suggested rule is that the court should decide whether the dissolution of the contract should be total or only partial. Under the circumstances of the present case, we think the dissolution of the contract should be partial only, since the obligor had taken care of the obligee for approximately six years before the obligor died. As a result, an effort should be made by the court to restructure or re-balance the obligations of the parties, so as to place them as nearly as possible in equal positions. In Richardson v. Cole, supra, and in Acosta v. Cole, supra, *480 this same rationale was applied by allowing the defendant to keep the fees for the dancing lessons already furnished but requiring the defendant to return to plaintiff the fees for the lessons which plaintiff was unable to take after she became disabled.
In the present case, the solution requires that some value be given to the services performed by Clargia in taking care of Curley from the time of the conveyance of the 26 acres until the time of Clargia's death, a period of about six years. There is no evidence in the record to show the exact value of these services. However, Clargia's services in caring for his brother for these six years clearly had substantial value. In the present case, we need not be too precise in determining the exact value, because the value of these services, which constituted an onerous obligation of the donation, can be added to the value of the services rendered by Clargia and his wife before the 1975 conveyance, which services were those for which the donation was remunerative. The total value of the services rendered before and after the 1975 donation is clearly as much or more than the $28,000 value of the 26 acres. Thus, the 1975 donation is valid.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the plaintiff-appellant.
AFFIRMED.