527 So.2d 982 (1988)
Grover R. HOGAN, et al., Appellants,
v.
Evelyn Shipp McKEITHEN, et al., Appellees.
No. 19568-CA.
Court of Appeal of Louisiana, Second Circuit.
May 4, 1988.
Rehearing Denied May 26, 1988.
*983 Peters, Ward, Bright & Hennessy by J. Patrick Hennessy, Shreveport, for appellants.
Culpepper, Teat, Caldwell & Avery by James D. Caldwell, Jonesboro, for appellees.
Before HALL, FRED W. JONES, Jr., and LINDSAY, JJ.
FRED W. JONES, Jr., Judge.
Plaintiffs sued to annul a cash deed for among other things, lack of consideration and, alternatively, to recover the consideration allegedly due. From a judgment rejecting their demands, plaintiffs appealed. For the reasons set forth, we reverse.
Barton Stone and Inez Stone, husband and wife, were residents of Jackson Parish. Arthur McKeithen, a physician, was also a resident of Jackson Parish and a friend of the Stones. McKeithen died in 1982; Mrs. Stone died in February 1984; and her husband died in July 1984.
Upon the death of Barton Stone, an attorney for the McKeithen heirs entered a bank box (with court approval) listed in the names of McKeithen and Barton Stone and found the original of a cash deed dated April 8, 1978, under which the Stones conveyed, for a recited cash consideration of $100,000, 120 acres of land (less the mineral rights) in Jackson Parish to McKeithen. On the instructions of Mrs. McKeithen, the attorney filed the deed for recordation in the office of the Clerk of Court for Jackson Parish.
Also found in the bank box was the copy of a promissory note (unsigned), dated April 1978, purportedly made by McKeithen in favor of the Stones for $100,000, providing for the payment of interest on a monthly basis and for the principal on demand at a rate of not more than $20,000 annually. In addition, the bank box contained wills executed by the Stones on April 8, 1978 in which each left to McKeithen his or her interest in the described promissory note.
Grover Hogan and Aston Hogan, sole heirs of the Stones, filed this suit on September 5, 1984 against McKeithen's widow and heirs.
Plaintiffs claimed relief under several theories. First, it was contended that the sale was never final because no consideration was paid and thus the deed was recorded "in error". Second, if consideration was paid, it was represented by the $100,000 note which was past due and unpaid. Third, since the Stones never relinquished possession of the property, continued to pay taxes on it after the "sale", and received no consideration, it is alleged the sale was a simulation, rather than a true sale. Finally, it was argued that if not a pure simulation, the transaction was a disguised donation and invalid for lack of form and because it violated La.C.C. Art. 1489's prohibition against physicians receiving donations from those they treat during last illnesses. They requested judgment for $100,000 as payment of either the consideration recited in the deed or the promissory *984 note; or judgment declaring the deed null and void or declaring the donation invalid and returning the property to them, as the Stones' heirs.
Defendants filed exceptions of No Cause of Action, No Right of Action and Prescription. They claimed plaintiffs had no cause of action to enforce payment of the copy of the unsigned note, since no person is liable on an instrument unless his or her signature appears thereon; that they had no cause of action to seek payment for the land since the deed contained an acknowledgment of receipt of consideration, and the parol evidence rule precludes contradiction of the act in the absence of fraud, mutual error or force. They further claimed that as plaintiffs were not "holders" of the note, as defined by R.S. 10:3-301 and 10:1-201, they had no right of action to enforce payment, and the "deadman's statute" (R.S. 13:3721) prohibited them from proving this debt with parol evidence. Finally, defendants claimed the suit was instituted more than 5 years after the date of the debt sued upon, and thus had prescribed, citing La.C.C. Art. 3477 and La.C.C. Art. 3498. The trial court referred these exceptions to the merits.
Defendants answered, denying that no consideration was paid and that the Stones retained possession of the property, and asserted the affirmative defenses of voluntary remission and confusion of McKeithen's debt to the Stones based on the fact that the Stones left their interest in the promissory note to McKeithen in their wills.
At trial, which was held on June 22, 1987, plaintiff Grover Hogan testified that he retained possession of the subject property and paid all taxes on it since his uncle's death, and that to his knowledge no one else attempted to take possession of the property since then.
Evelyn Shipp McKeithen, widow of Arthur McKeithen, testified on cross-examination that she entered her deceased husband's safety deposit box at the Hodge Bank & Trust Co. on December 15, 1982, in the presence of Bob Cone, then president of the bank.
Her testimony regarding what she found in the bank box is unclear. At first she said she found "a note" and left it in the box, later turning it over to her attorney. However, after objections from opposing counsel that the questions were vague, and when pressed to say whether she definitely found the original of the promissory note from McKeithen to the Stones or not, she was unable to do so. She then said she didn't really remember what she found in the box the first time she opened it, but that later she removed everything in the presence of her attorney, and turned it over to him. She was also unable to say in whose name the safety deposit box was registered.
In defendants' answers to interrogatories, it was asserted that consideration was paid by McKeithen to the Stones, which consideration was evidenced by the cash sale deed signed by the parties. The interrogatory answers also indicate that McKeithen left no instructions regarding the "deed" and the following admissions of fact were made:
1) Neither defendants, Arthur McKeithen or his succession has ever taken any action aimed at taking possession of the subject property, including paying taxes;
2) No payments on the promissory note have been made by defendants, McKeithen or his succession;
3) No money whatsoever has been paid to the Stones since April 8, 1978;
4) No services for which payment was not made from April 8, 1978 to date were rendered by defendants, McKeithen or his succession.
Defendants denied knowing the whereabouts of the original note, and moreover, denied its existence.
After the testimony of Hogan and Mrs. McKeithen was heard, the case was submitted on the basis of exhibits and deposition testimony. At this time, the trial judge overruled the defendant's exception of no cause of action.
Hayward Quarles testified that he notarized the cash deed in question at the *985 Stones' residence. It was his understanding that the Stones were going to record the instrument. He did not see McKeithen pay the consideration of $100,000 to the Stones.
Don Burns, attorney, stated that he had copies of the cash deed, the wills of the Stones, and the promissory note, purportedly executed by McKeithen in favor of the Stones, in his files, but that he had no recollection of the execution of these documents. He never received any payments on the note during the brief period of time in 1981 during which the witness handled Stone's interdiction.
McKeithen's daughter, Mrs. Meredith, testified that the Stones frequently visited in the home of her parents, but the witness had no knowledge of the cash deed or the promissory note.
Charles Allen, president of Jonesboro State Bank, testified that he had known the Stones approximately 40 years, on both a personal and professional basis, as they banked with him and also were close friends of his.
He was appointed provisional curator of Stone in September 1981. When he took over at this time, there was approximately $30,000 in the Stones' savings account and less than that in their checking account. In 1978 the witness placed some of Stone's money in his own personal bank lock box as a favor to Stone. Stone would from time to time bring him various amounts of cash, and he (the witness) would put it in an envelope with Stone's name on it and put it in his box. Then later Stone would return and retrieve some of the money. However, at no time did Stone ever bring to him or deposit with him in any manner $100,000 in cash or otherwise. He never saw evidence of Stone ever possessing that much money at one time, and believed as Curator that he would have been aware of it if he had.
The witness knew nothing about the "cash sale deed," and did not even see the document until after Stone's death. While he was acting Curator, the taxes on the property described in the deed were assessed to Stone, and the witness paid them out of Stone's funds.
Allen had seen a copy of the promissory note, but no payment of $20,000 was made to Mr. or Mrs. Stone while he was acting Curator (1981-1983), and he would have known about such a payment if it had been made and had gone through curatorship. He knew of no such payments being made before he was Curator, in 1979-80. He never saw evidence of Stone ever having such a large sum of money at one time.
Mary Conklin stated that she worked for Dr. McKeithen at the Hodge Clinic for 20 years. The witness knew the Stones and said they were patients of McKeithen for 8-10 years. She witnessed the cash deed but did not see McKeithen give the Stones the consideration of $100,000.
Mrs. McKeithen, widow of the doctor, also testified by deposition. She had been friends with the Stones for many years before their deaths, but was not aware of the 1978 "purchase" by her husband of some property from them. She knew nothing of the deed until after her husband's death, when her attorney inventoried her husband's bank box, which contained the wills, the deed, and a copy of the unsigned note. The bank box contained no evidence of a $100,000 payment by Dr. McKeithen to the Stones. She was executrix of her husband's estate, and when she and her attorney gathered his records, they found no evidence of McKeithen making a $100,000 payment to anyone in 1978. She has looked through everything, including his tax records, and could find no evidence at all of such a payment. She did not believe that her husband had that kind of cash.
Although the Stones told her they had made wills leaving everything to her and her husband, they never said anything to her about the deed, and neither did her husband.
She did not know why the deed was not recorded during McKeithen's lifetime. He left no instructions regarding recordation, but when it was found in the bank box, she told her attorney to record it. He did so on July 17, 1984.
*986 She never paid taxes on the property. In explanation, she said she did not know about the property before her husband's death, and the Hogans were contesting the deed afterwards. She has never leased any minerals, granted rights of way, sold timber, planted anything, nor even visited the property. She did not know if her husband paid any taxes on the property before his death, but there was no indication of this in his records. She did not list this property as an asset in her husband's succession because she did not consider it as belonging to her at the time.
A copy, but not the original, of the unsigned promissory note was also found in the bank box. She searched unsuccessfully for the note among her husband's papers. Her husband did not discuss with her anything in connection with it. She has no knowledge of her husband signing such an instrument, or making any payments on it. She did not pay any money to the Stones on April 8, 1978, and did not know why the note was in their will.
The safety deposit box was in her husband's name. She did not know whether Barton Stone or anyone else had access to it.
Max Robinson, who was Dr. McKeithen's office manager, testified that he witnessed the execution of the cash deed but did not see payment by McKeithen to the Stones of any consideration nor did he hear any discussion of payment. The witness stated that he sometimes paid McKeithen's bills as part of his duties, but never paid any large sum in the form of cash or otherwise to the Stones for McKeithen.
In written reasons for judgment, the trial judge concluded that there was no direct evidence that McKeithen did not pay the recited consideration in the cash deed. Therefore, the trial judge refused to invoke the presumption of simulation and shift the burden of proving a valid sale to the defendants. The trial judge also refused to receive parol evidence to prove a simulation. Also, no mutual error was found to justify setting the deed aside. Furthermore, the trial judge found, since plaintiffs had not sued within one year of McKeithen's death to recover the $100,000 consideration, the action was prescribed under La. R.S. 13:3721 (deadman's statute). In addition, even if a valid obligation, suit on the promissory note was prescribed by the three years liberative prescription of La.C. C. Article 3494.
For these reasons, judgment was rendered sustaining defendants' exceptions of prescription and no right of action and dismissing plaintiffs' suit.
Plaintiffs appealed this judgment, claiming the trial court erred in these respects:
1) Upholding the validity of the deed where the evidence proved the sale was never completed;
2) Failing to invoke the presumption of simulation when the Stones remained in possession of the property allegedly transferred;
3) Failing to allow parol evidence to prove a donation from the patient to the physician in fraud of the law;
4) Erroneously stating in his written opinion that defendants objected to some of plaintiffs' exhibits on the basis of hearsay;
5) Applying the "deadman's statute" to a suit involving a lost note;
6) Holding that the note had prescribed.
The defendants answered the appeal, claiming that they were aggrieved by that portion of the trial court judgment denying the exceptions of no cause and no right of action.
Admissibility of Parol Evidence to Controvert the Cash Sale Deed
While parol evidence is generally inadmissible to vary or contradict the clear and unambiguous terms of an authentic act or written instrument, one of the limited jurisprudentially created exceptions to this rule is that as between parties to a transaction, parol is always admissible to prove want or failure of consideration. Scafidi v. Johnson, 420 So.2d 1113 (La.1982); Gulf States Finance Corp. v. Airline Auto Sales, Inc., 248 La. 591, 181 So.2d 36 (1965); Matherne v. Rise, 479 So.2d 580 (La.App. 1st Cir.1985); Pierce v. Thompson, *987 468 So.2d 1379 (La.App. 1st Cir.1985); Brumfield v. Brumfield, 457 So.2d 763 (La.App. 1st Cir.1984); Fly v. Hand, 376 So.2d 1016 (La.App. 1st Cir.1979); Laspopoulos v. Chaisson, 413 So.2d 248 (La.App. 4th Cir.1982), writ denied, 420 So.2d 170 and 420 So.2d 171 (La.1982); Rosenthal v. Oubre, 504 So.2d 1102 (La.App. 5th Cir. 1987).
Another jurisprudentially created exception to the parol evidence rule is that parol may be received to prove allegations of simulation, or to show that a purported "sale" was actually intended by the parties to be a donation. See Whitten v. Whitten, 303 So.2d 238 (La.App. 2d Cir.1974); Walker v. Wilson, 294 So.2d 891 (La.App. 2d Cir.1974); Ducote v. Stark, 87 So.2d 770 (La.App. 2d Cir.1956); Williams v. Collier, 249 So.2d 298 (La.App. 1st Cir.1971), writ refused, 252 So.2d 669 (La.1971); Brumfield, supra.
La.C.C. Art. 1848, formerly Art. 2276, and effective January 1, 1985, now incorporates this jurisprudential exception. It provides that in the interests of justice, testimonial or other proof may be received to prove a relative or absolute simulation. (See Article 1848, Comment c).
It is also well established that the true cause or consideration for a contract may be shown by parol evidence, even though the true consideration is different from that which is recited in the written act. Smith v. Southern Kraft Corporation, 202 La. 1019, 13 So.2d 335 (1943); Love v. Dedon, 239 La. 109, 118 So.2d 122 (1960); Pilcher v. Gillen, 314 So.2d 741 (La.App. 1st Cir.1975), writ denied, 320 So. 2d 202 (La.1975); Sauce v. Williams, 434 So.2d 613 (La.App. 3d Cir.1983); Victorian v. Victorian, 411 So.2d 473 (La.App. 3d Cir.1982); Bell v. Bell, 339 So.2d 1333 (La. App. 3d Cir.1976).
Our Civil Code defines simulation as a contract which, by mutual agreement, does not express the true intent of the parties. La.C.C. Art. 2025. Simulations are absolute when the parties intend that the contract shall have no effect between them, La.C.C. Art. 2026, and relative when the parties intend that the contract shall produce effects different from those recited in the contract. La.C.C. Art. 2027.
Discussing the nature and proper method of attacking simulations, our Supreme Court, in Owen v. Owen, has stated:
"... In our law, a simulation is a transfer of property which is not what it seems. Simulations are of two types: pure simulations and disguised transfers. In a pure simulation, sometimes called a non-transfer, the parties only pretend to transfer the property from one to the other, but in fact both transferror and transferee intend that the transferror retain ownership of the property. When this type of simulation is successfully attacked, the true intent of the parties is revealed, which was that no transfer had in fact taken place. In a contest between a vendor and a vendee in this situation, the true intent of the parties is effectuated and the courts hold that no transfer took place because the simulated sale is an absolute nullity [Citations omitted]. The other type of simulation is a disguised transfer which seems on its face to be a valid sale, but which is intended by the parties to be a gift rather than a sale. When this sort of simulation is attacked successfully, ... the true intent of the parties is likewise effectuated by the law. A valid transfer has taken place, but its form is a donation rather than a sale and the Code Articles on donations apply to the transfer," (Citations omitted). 336 So.2d 782, 786 (La. 1976).
A pure simulation may be annulled at any time by the heirs of the apparent vendor or any interested person. Succession of Terral, 312 So.2d 296 (La.1975). Relative simulations produce between the parties the effects they intended if all requirements for those effects have been met. La.C.C. Art. 2027.
The burden is initially upon the one alleging pure simulation to prove this claim. However, retention of possession by the apparent vendor of the property purportedly transferred raises a rebuttable presumption of simulation. La.C.C. Art. *988 2480. In addition, a jurisprudential presumption of simulation arises when the evidence establishes the existence of facts and circumstances which create a highly reasonable doubt as to the reality of the putative sale. Succession of Cloud, 508 So.2d 577 (La.App. 2d Cir.1987), writ granted, 513 So.2d 280 (La.1987); Kennedy v. Bearden, 471 So.2d 871 (La.App. 2d Cir.1985); Wilson v. Progressive State Bank and Trust Co., 446 So.2d 867 (La.App. 2d Cir.1984). The burden then shifts to the one claiming rights under the putative sale to establish the reality of the sale. This is done by proving a good faith transaction resulting in a true alienation of ownership for consideration. Russell v. Culpepper, 337 So.2d 226 (La.App. 3d Cir.1976), affirmed, 344 So.2d 1372 (La.1977); Kennedy v. Bearden, supra; Succession of Cloud, supra.
The trial court here erred in refusing to invoke a presumption of simulation. The testimony indicates that the Stones, and after their death, plaintiffs, never relinquished possession of the property. Even if the execution of the deed is considered as delivery of the property, thus casting doubt on the applicability of the codal presumption of La.C.C. Art. 2480, the judicial presumption is applicable. Since plaintiffs alleged simulation, and parol on the issue is thus admissible to contradict the deed, the testimony, which fails to show any payment of consideration, creates a "highly reasonable doubt" as to the reality of the sale. The McKeithens therefore had the burden of establishing a valid sale or donation inter vivos.
It is clear from the record that the McKeithens have failed to prove that cash consideration was paid for the land. Moreover, the only evidence of payment of consideration of any kind is Quarles's testimony that Dr. McKeithen placed his employees at the disposal of Stone and hired a nurse to care for him. Therefore, unless the evidence establishes a valid donation, the transfer must be set aside as a simulated or incomplete sale.
The question in this regard is whether there is sufficient evidence to conclude that the Stones intended this transaction as a donation of their land to Dr. McKeithen. There is not. The most convincing evidence which indicates this intent is the testimony of the notary who executed the deed. He testified that before their deaths, the Stones told him they were deeding their land to McKeithen in exchange for his taking care of them. If this evidence were considered, it would probably establish that the transaction was intended as an onerous donation. La.C.C. Arts. 1523, 1524. However, this evidence was properly excluded as hearsay by the trial judge. The only declarations by a person since deceased which are admissible as exceptions to the hearsay rule are dying declarations, statements against interest, and in rare instances, statements pertaining to family history or relationships. Miller v. Miller, 226 La. 273, 76 So.2d 3 (1954); Reed v. Thomas, 355 So.2d 277 (La.App. 2d Cir.1978), writ denied, 357 So.2d 1153 (La. 1978).
The only other evidence supporting the contention that the Stones intended to donate their property to McKeithen is the copy of the unsigned promissory note drawn as an obligation of McKeithen in favor of the Stones, and the wills of Barton Stone and Inez Stone, both leaving their interest in this note to McKeithen. However, this circumstantial evidence, without more, is insufficient to prove that the Stones intended to donate their property to McKeithen by the cash sale deed.
To summarize, we hold that parol evidence was admissible to prove a lack of consideration for the deed executed by the Stones in favor of McKeithen; evidence proved the lack of consideration; and the evidence did not prove the instrument was in fact a donation. Therefore, the deed is null and void. This disposition of the case pretermits a consideration of the other issues raised by plaintiffs.
Decree
For the reasons set forth, the judgment of the trial court is REVERSED, and there is judgment in favor of plaintiffs and against the defendants declaring null and void the cash deed executed on April 8, *989 1978 by the Stones in favor of Arthur McKeithen, recorded in Conveyance Book 207 at page 197 of the records of Jackson Parish, Louisiana, and ordering the inscription thereof cancelled and erased from the records of Jackson Parish, Louisiana. All court costs, both in the trial court and on appeal, are assessed to the defendants.

ON APPLICATION FOR REHEARING
Before HALL, MARVIN, JASPER E. JONES, FRED W. JONES, Jr., and LINDSAY, JJ.
Rehearing denied.