Judgment rendered November 26, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,469-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

THE GUIDE COMPANY, LLC                    Plaintiff-Appellee

versus

MADISON PARISH HOSPITAL                   Defendant-Appellant
SERVICE DISTRICT D/B/A
MADISON PARISH HOSPITAL

* * * * *

Appealed from the
Sixth Judicial District Court for the
Parish of Madison, Louisiana
Trial Court No. 202,348

Honorable James Hugh Boddie, Jr., *(Ad Hoc Judge)*

* * * * *

HUDSON, POTTS, & BERNSTEIN            Counsel for Appellant
By: Gordon L. James

COTTON, BOLTON, HOYCHICK,             Counsel for Appellee
& DOUGHTY, LLP
By: David P. Doughty

* * * * *

Before STONE, ROBINSON, and HUNTER, JJ.

**STONE, J.**

This civil appeal arises from the Sixth Judicial District Court, the Honorable James Boddie, Jr., presiding. The Guide Company, LLC ("Guide"), appellee, sued the appellant, Madison Parish Hospital Service District ("Madison"), for breach of contract. Madison reconvened, demanding return of all money it paid to Guide pursuant to the contract between them. On June 26, 2024, a bench trial on the merits was held and, thereafter, the trial court took the matter under advisement. On December 17, 2024, the trial court signed a judgment ordering Madison to pay Guide $28,000 for unpaid consulting fees but rejected Guide's demand for attorney fees. It also dismissed Madison's reconventional demand with prejudice. For the reasons stated herein, we reverse the judgment of the trial court both as to the main demand and the reconventional demand.

### FACTS AND PROCEDURAL HISTORY

The trial was held on June 26, 2024. Notably, the record is devoid of any discovery motions, subpoenas, depositions, etc. The parties stipulated to the admissibility of all of the exhibits entered into evidence; however, Madison challenged the authenticity of Donald Frutiger's signature on Defendant's Exhibit 2, p.3 (the purchase order form authorizing payment of $6,000 per month to Guide in perpetuity). Guide called two witnesses, Dr. Ted Topolewski ("Dr. Topolewski") and Sonny Paxton ("Paxton"). Madison called one witness, Dr. Donald Perry ("Dr. Perry").

*Dr. Topolewski's testimony.* In 2011, several people involved in the hospital's administration went to jail in connection with the embezzlement of roughly $6 million from Madison. Dr. Topolewski served as the hospital director for Madison from 2014 to October 14, 2022. He stated that he was

hired by the state as a "turnaround CEO" to help save Madison from financial collapse. Six or eight months into his tenure, he requested that Madison be placed under state fiscal administration to escape the pressure from local government to provide patronage jobs. This request was granted and Donald U. Frutiger ("Frutiger") served as fiscal administrator at Madison for about six years. According to Dr. Topolewski, Frutiger was Dr. Topolewski's "boss." Elsewhere in his testimony, however, Dr. Topolewski claimed that he had statutory authority to bind Madison to the contract with Guide (and *additionally* obtained Frutiger's approval). During Frutiger's term as fiscal administrator, Guide entered a consulting agreement with Madison and four months thereafter, Frutiger requested that the state's fiscal administration of Madison be terminated for lack of need — and such request was granted.

Dr. Topolewski claimed that he did not know Paxton at all prior to inviting him to provide consulting services to Madison and further denied any type of patronage motive. He explained how he arrived at his decision to hire Paxton as follows:

> Q. And, let me ask you this, why did you contact Mr. Paxton about this [consulting work for Madison]?
>
> A. A mutual friend of Sonny and I, in fact, he's in the audience, Don Woods, introduced me to him. I had spoken to Mr. Woods saying that — and I know Mr. Woods from the Tallulah Country Club. We were friends before, casual friends. I had said to him that I would like to find someone to help me navigate the bureaucracy of Baton Rouge, the Department of Health, the Medicaid program. The hospital was having several issues of getting things done with the bureaucracy. I was up against a brick wall, and I said I would like to have someone that knows his or her way, people down there, to help the hospital. I've done that at other hospitals in other states, having people like — a lot of times it's a retired State Senator or former State Commissioner who knows who to put the piece of paper to to get things done. So, at that point, Mr. Woods says, "I got a guy."

2

Dr. Topolewski explained his conversation with Paxton leading up to the agreement as follows:

> Q. In regards to that [conversation], what did you discuss with Mr. Paxton?
>
> A. Well, I discussed what the hospital would like someone with this consulting agreement to do. Number one, there were various reimbursement issues on the clinics and the hospital, that were festering at the Department of Health. They were, annually, hundreds of thousands of dollars. So, I was anxious to get that done. I wanted someone also that knows the capital programs here for grants to apply to, and also, I said I'm interested in doing some behavioral health here, and I'd like to be introduced to some firms that are in that business to partner with. So I gave him a flavor of what I would expect, and of course, there might be other consequential items in there, but that was the main thrust of what I said.
>
> Q. Okay. And what did Mr. Paxton tell you with regards to that?
>
> A. He told me he has — he could help me on the reimbursement problems. He mentioned some names, I can't recall them right now, that he said he could bring our issues to that have been placed down there, and hopefully get some results. With behavioral health, he says he knew a gentleman that is in that business that would like to come into this area here, and he will contact him on that. And he said he would work on the grants. He knew some legislators and all that would be favorable to our grant requests. So, he said he could do what I want at that point.
>
> Q. And is that — at that point, is that when the hospital drew up this consulting agreement that I have in my hand?
>
> A. Yeah, I wanted to make sure he knew what he was doing and had some results, so at that point, we drew up this contract

The Madison-Guide Consulting Services Agreement (the "agreement" or "contract"), which is in evidence, was signed on April 19, 2019 by Paxton for Guide and Dr. Topolewski for Madison. Dr. Topolewski also stated that he obtained Frutiger's approval for the contract. The contract states:

3

The specific scope of services for [Guide] are;

Monitoring and researching any governmental or public relations issues which might affect the Hospital and its planning....

Keeping the Hospital informed and advising the Hospital relative to any such governmental or public relations issues.

Representing the Hospital in discussions with any appropriate individual government official or officials as well as any government entity or any public interest or citizen group which might wish to discuss issues relative to the Hospital and its planning.  Specific examples of the abovementioned are State Bond Commission, Capital Grant Requests, Hospital State Legislator, Hospital State Senator, State Department of Health, and State Fire Marshall regarding licensure of new hospital.

Such other services as the Hospital's CEO may determine are necessary for the implementation of the hospital's objectives.

In return for Guide's services, Madison promised to pay $6,000 per month (later increased to $7,000 per month) and reimburse Guide for "out-of-pocket expenses."  The exhibits in evidence include all of Guide's monthly invoices.  Dr. Topolewski personally approved payment of each individual invoice.

Dr. Topolewski testified that he had given his secretary a standing order to send every hospital contract to the hospital's attorney, Jack M. Stolier ("Stolier"), for review.  Dr. Topolewski assumed that, per his standing order, his secretary sent a copy of the Madison-Guide contract to Stolier for review, but he did not know whether his secretary actually sent it or whether Stolier had approved it — despite his earlier testimony in an affidavit asserting that Stolier had indeed approved the contract.

Regarding Guide's performance, Dr. Topolewski stated:

Q. And did Mr. Paxton provide services on behalf of the

4

hospital in connection with what we're talking about?

A. He provided all of the services requested, and then some, in my opinion.

Q. If you would, describe what are some of what Mr. Paxton did, that you had -- you contacted him about and what he did for the hospital.

A. First, we had one of our rural health clinics that we had purchased a while back, we had a reimbursement problem. It was a physician-based practice. We wanted to change it to hospital based. That alone is worth probably $200,000 a year of reimbursement annually on that. We were having no luck of getting the Department of Health and the Medicaid program within the Department of Health of okaying it on that. We tried various things. I even had a state legislator go down and try to do it. We just couldn't get it done. Within, I'd say, a month of the signing of this contract, it was done. Mr. Paxton went there and contacted, I don't even know who, but it was stamped and we had that done, which amazed me. We were trying for months to get that probably a half a year.

According to Dr. Topolewski, Paxton also:

- negotiated a lower price for land acquisitions and leases than Dr. Topolewski felt he could have gotten as a New Yorker representing Madison;
- introduced Dr. Topolewski to Jeff Richardson who was "interested in partnering with the hospital" in establishing a behavioral health services facility in the parish; (this project allegedly was near the contract-drafting phase when Dr. Topolewski was terminated as Madison's CEO);
- used his political connections to help speed up the loan application process for a $38 million government loan to build a new hospital; the loan was issued and the new hospital was built.

Dr. Topolewski was fired as CEO/hospital director on October 14, 2022. On the day before his termination, Dr. Topolewski sent an email instructing payment — of Guide's November 2022 invoice — promptly on November 1, 2022. Through its new CEO, Dr. Perry, Madison terminated the contract with Guide shortly after Dr. Topolewski's firing.

5

On cross-examination, Dr. Topolewski admitted that he is friends with Paxton and that they have talked since termination from their respective relations with Madison. Dr. Topolewski has a pending lawsuit against Madison but said that his lawsuit is unrelated to the subject contract herein. He acknowledged that the invoices by which Guide billed Madison showed only "consulting" in the details of the charges — without further explanation of the services that Paxton claimed to have actually provided. Dr. Topolewski admitted that he did not require Paxton to provide such details on the invoices, but instead, received them verbally. He initially implied that his initials had been forged (as approval for payment) on the November 2022 invoice — which was received and approved in Dr. Topolewski's name on October 13, 2022. However, that same day at 9:02 AM, Dr. Topolewski's work email account sent a message to Kallie Blake requesting that the premature invoice be paid on November 1, 2022.[1] When presented with a copy of the email, Dr. Topolewski first denied any recollection. The following exchange thereafter ensued:

> Q. Well, let me show you. Page 141, "I believe Sonny will be away, so he wants to make sure we have the November invoice. Please pay at the beginning of November."
>
> A. All right. You're refreshing my memory on that one.
>
> Q. So, that November invoice was paid. Were you ensuring that your friend got paid when you knew there was going to be a change in administration?
>
> A. Absolutely not what you're insinuating on this. Absolutely not. I take objection to that question.
>
> Q. Is that something you did routinely, say "go ahead and pay next month's invoice"
>
> A. I take objection to that question.

[1] R. 123-6; Pg. 140-141 of Exhibit D-2.

6

Q. Can I ask you again, sir? Is that something you routinely did, said, "let's go ahead and get ready to pay this next month's invoice?"

A. I believe I would have done that several times if someone said to me, "I'm going to be away and here's my invoice." I would have done that to other consulting companies.

Q. And is it fair to say that you're bitter at this time over the actions taken by the hospital board?

A. I'm not going to tell you if I'm bitter or not.

Q. Okay. You've got a lawsuit filed against them?

A. That is correct.

On redirect, Dr. Topolewski stated that he kept Frutiger abreast of Paxton's work and that Frutiger was pleased with that work (i.e., for the four months in which the contract coincided with the state's fiscal administration).

*Testimony of Sonny Paxton.* Paxton stated that he was born in Tallulah, Louisiana, and raised between Tallulah and Vicksburg, Mississippi. He further stated that he served as Louisiana's Deputy Secretary of Wildlife and Fisheries in Baton Rouge in the 1980s (and made numerous contacts in the healthcare field during that time); and that he moved to Georgia in 2001 where he continued to live until June 2021, when he moved back to Madison Parish, Louisiana. Paxton admitted that his wife owns Guide, and through it, she sold merchandise on the internet before and during his consulting work for Madison.

Paxton testified that he did not know Dr. Topolewski before Dr. Topolewski contacted him about working for Madison as a consultant. He helped Madison with obtaining the lease of the land on which the new

hospital was built and he explained that he had known the landowners "all…[his] life."

Paxton alleged that he got U.S. Senator Bill Cassidy ("Sen. Cassidy") to help secure the $38 million U.S. Dept. of Agriculture ("USDA") loan for building the new hospital facility, and that Sen. Cassidy is "the reason it got done." He also stated that he used his contacts in Baton Rouge to get Madison's rural health practice reclassified from "physician-based to hospital-based" (which, according to Dr. Topolewski, increased revenue by $200,000 annually). Paxton also described his work on helping Madison partner with a behavioral health operator, but Madison stopped pursuing it after Dr. Topolewski was fired.

Finally, Paxton discussed his billing practices and termination of the contract. He stated that nobody from Madison ever asked him for written details of the services provided in connection with the invoices he submitted. Paxton submitted the invoices at the beginning of the billing period — the beginning of the month. Paxton initially did not know whether his invoice from November 24, 2022, had been paid; later, he said that was for the services he would render in December of 2022.[2]

Paxton admittedly received a letter from the interim CEO/hospital director who replaced Dr. Topolewski, Dr. Perry, which was dated January 24, 2023. It notified him of the termination of the contract and the hospital's position that it was never a valid contract in the first place.[3] However, the letter also invited Paxton to prove that Guide had a valid contract with

---

[2] Exh. P-2.

[3] Exh. P-4.

Madison and that he "legally performed" those contractual obligations, and Madison would reconsider. Paxton offered no information whatsoever, explaining that, as far as he was concerned, he already "had a valid contract to start with." Instead of providing the requested information, Guide/Paxton hired an attorney who sent a letter threatening a lawsuit if Madison did not pay $28,000 to Guide within seven days of the date the letter. Parenthetically, this demand letter offered nothing responsive to Dr. Perry's invitation to Paxton to provide documentation showing that he had actually rendered services pursuant to the agreement.

Thus, Guide's invoices from December 2022 through March 2023 went unpaid despite Paxton allegedly continuing to work at least through January of 2023. On direct examination, Paxton stated that he was working on the prospective behavioral health partnership at the time "these terminations occurred," i.e., Dr. Topolewski's termination on October 14, 2022, and the contract termination on January 24, 2023. Paxton specifically claimed that he was "absolutely" working on the behavioral health project at the time he submitted the November 24, 2022 invoice (for consulting services to be rendered in December 2022). Paxton further claimed that he kept working on the behavioral health project even after the hospital quit paying his invoices. On cross-examination, Paxton admitted he had not communicated with the new administration at all while he was allegedly doing this work:

> Q. Is it your testimony that you continued working for the hospital after Dr. Topolewski left?
>
> A. I would say yes, simply because that mental health clinic was in motion. That's not something you can just stop.

Q. When you were doing that work, who were you consulting…with [at] the hospital, to tell them what you were doing?

A. I wasn't consulting with anybody. I didn't know who to contact.

As Paxton acknowledged, however, he had already been contacted by the new CEO before performing any alleged work he did in February and/or March of 2023.

Paxton also stated that he lost his records of his work performed as a consultant for Madison in the move back to Louisiana from Georgia in June 2021. In the next breath, however, he seemingly stated that he did not make such records in the first place.[4] Paxton conclusively admitted that he could not provide a monthly breakdown of the services he had performed.

*Invoices in evidence.* The evidence includes every monthly invoice Guide submitted to Madison, along with Topolewski's emails instructing payment of each invoice and bank receipts showing that the payments were made. From the commencement of the contract in April 2019 until June 2021, Guide's invoices typically showed that Paxton drove from Suwanee, Georgia, to Tallulah and other locations in Louisiana as part of his work for Madison; the stated purpose of these trips was to attend meetings. Most such meetings were just with Dr. Topolewski. For these months, Guide billed Madison an additional $500 to $1500 for "out-of-pocket expenses," including mileage, meals, and lodging. The invoices concerning October 2020 and February 2021 assert that Paxton drove from Suwanee, Georgia, to Tallulah to meet with Dr. Topolewski for lunch and then drove back to Suwanee the same day. Some meetings that Guide claimed included

---

[4] R. 137-138.

10

Madison Parish landowners, Jeff Richardson ("Richardson"), a state senator, and/or representatives of insurance companies. However, in April 2021[5] (i.e., shortly before Paxton's move back to Louisiana in June 2021), the monthly consulting fee increased from $6,000 per month to $7,000 per month; from June 2021 until the termination of the contract in January 2023, Guide claimed no out-of-pocket expenses and provided no details regarding any "consulting" services performed.

Below, we detail the invoices which bear specific information of what Paxton did:

- Invoice dated April 4, 2019, shows that Paxton made three trips from Georgia to Tallulah, first, to meet with Dr. Topolewski, Jeff Richardson, Alan Barksdale, etc.; second, to "discuss consulting contract" with Dr. Topolewski, and, last, another trip to sign the contract

- Invoice dated April 30, 2019, shows that, in April 2019, Paxton made a trip from Georgia to Tallulah: "purpose of trip was to meet with Dr. Topolewski, Robert Laurents, Jeff Richardson, Mark Fontenot (LARIS Insurance Agency) and the Perret Group, LLC, represented by Leonard Franques and Hunter Perret"

- Invoice dated August 1, 2019, shows a trip from Georgia to Tallulah that included "follow up with Warren S. Patrick, Jr. to discuss land lease on 19th of July"

- Invoice dated September 1, 2019, shows a trip from Georgia to Tallulah that included "follow up with Warren Patrick, Jr. to discuss land lease on 19th of July"

- Invoice dated October 2, 2019, shows two trips from Georgia to Tallulah in September 2019, first, to meet with "Pat Patrick and Rhonda Cobb concerning lease with the Madison Parish Hospital" and, ten days later, another such trip to meet with Pat Patrick to "discuss revised lease agreement"

- Invoice dated January 1, 2020, asserts that in December 2019, Paxton made a trip to Tallulah to meet with Irene W. Jackson of Delta Recovery, Outpatient Detox

---

[5] Exhibit D-2, p. 84.

- Invoice dated February 1, 2020, asserts that made Paxton made a trip from Georgia to Delhi, Louisiana, to meet with Senator Francis Thompson

- Invoice dated April 1, 2021, asserts a trip in March 2021 from Georgia to Baton Rouge, Louisiana: "purpose of trip was final deposition of $2,000,000 bond with La. Bond Commission. Additional purpose of meeting was the discussion of possible direction and additional services for new hospital, when completed

*Testimony of Dr. Perry.* Dr. Perry stated that he was a staff physician at the hospital before serving as interim CEO there. He admitted that Dr. Topolewski had fired him "years ago." When asked why he terminated the contract, aside from legal advice to do so, he indicated that it was because there was no documentation whatsoever of what consulting services, if any, Paxton had actually rendered. He stated that listening to the other witnesses' testimony was the first time he ever heard any allegation of what services Paxton allegedly performed for Madison.

*Attorney fees.* Both Paxton and Dr. Topolewski admitted they did not discuss legal expenses in negotiating the contract — it was not mentioned as an "out-of-pocket" expense.

*Action of the trial court.* The trial court awarded $28,000 in damages in favor of Guide and against Madison, denied Guide's claim for attorney fees, and denied Madison's reconventional demand. The trial court issued written reasons for judgment. Therein, the trial court stated that, after trial, it took the matter under advisement and "[o]ut of necessity…engaged in additional independent research, review, study, analysis, and deliberation." The trial court then admonished this court to follow the manifest error/clearly wrong standard of review and specifically held that the

testimony of Paxton was "credible and reliable."[6]  It further credited the testimony of Dr. Topolewski, which it found corroborated Paxton's testimony.  The trial court also held that the contract's provision — that Madison would reimburse Guide's "out-of-pocket expenses" — did not create an obligation to pay Guide's attorney fees.  The trial court rejected Madison's argument that the contract was "gratuitous" and, therefore, unenforceable.  Finally, the trial court rejected Madison's reconventional demand without comment.

## ASSIGNMENTS OF ERROR

Madison asserts that the trial court erred in: (1) considering evidence outside the record; (2) holding that the contract was enforceable; (3) not holding that the contract was absolutely null because Guide failed to register as a lobbyist as required by law; and (4) rejecting Madison's demand for $300,620 in reimbursement for fees paid.

## DISCUSSION

**Overview**

The basic facts surrounding the formation of the agreement are largely undisputed.[7]  However, Madison argues that because Paxton did not do anything for Madison, the contract is "gratuitous," and a "prohibited donation," i.e., a patronage job, a *simulation*.  Madison alternatively argues

---

[6] Paxton's wife owns Guide.  R. 128.

[7] Madison's counsel did cast doubt on the authenticity of Frutiger's signature on the purchase order authorizing payment to Guide.

13

that the agreement is an absolutely null contract for lobbying services by an unregistered lobbyist.[8]

Madison's allegation that the trial judge considered evidence that had not been admitted (and which was not otherwise in the record) seems plausible given the trial court's statement in its written reasons for judgment, i.e., that while the case was under advisement, "[o]ut of necessity…[the trial court] engaged in additional independent research, review, study, analysis, and deliberation." After that "independent additional research," the trial court decided the case exclusively on credibility findings — without one legal citation in its written reasons other than admonishing this court of the manifest error standard of review. This could be seen as indicating that the "additional independent research" was evidentiary rather than research of applicable law. However, we need not decide this issue because, regardless, we find that the trial court committed manifest error in crediting the testimony of Paxton or Dr. Topolewski.

Accordingly, Guide failed to carry its burden of proving that the agreement was a valid, enforceable contract. Furthermore, Guide had the burden, under La. C.C. art. 2022 and *Harter v. Harter*, 50,942 (La. App. 2 Cir. 11/10/16), 208 So. 3d 971, 980, *writ denied*, 17-0225 (La. 3/24/17), 217 So. 3d 353, of proving that it performed its contractual obligation in the months for which it sued to force Madison to pay the $7,000 monthly fee, and Guide failed there, too.

As to Madison's reconventional demand, it had the burden of proving the contract was null or non-existent; however, as explained below, a

---

[8] Finally, Madison implies that Dr. Topolewski lacked authority to bind Madison to this contract.

14

presumption of simulation applies when the surrounding facts and circumstances create a "highly reasonable suspicion" that there was no arms' length bargain between the parties. *Hogan v. McKeithen*, 527 So. 2d 982 (La. App. 2 Cir. 1988). We hold that the presumption applies here and that Guide has failed to rebut it.

Madison's argument regarding unlicensed lobbying is without merit because there is no evidence that Paxton's and/or Guide's conduct came within any statutory definition of lobbying.

**Standard of review**

"The determination of the existence of a contract is a finding of fact, not to be disturbed unless clearly wrong," i.e., manifestly erroneous. *Crowe v. Homesplus Manufactured Hous., Inc.,* 38,382 (La. App. 2 Cir. 6/21/04), 877 So. 2d 156. The Louisiana Supreme Court "has stated a two-part test for the reversal of a factfinder's determinations: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is clearly wrong or manifestly erroneous." *Read v. Willwoods Cmty.*, 14-1475 (La. 3/17/15), 165 So. 3d 883, 888. Manifest error review requires great deference to the factfinder's decisions regarding witness credibility. However, if documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error regarding a finding purportedly based on a credibility determination. *Lam ex rel. Lam v. State Farm Mut. Auto Ins. Co.,* 05-1139 (La. 11/29/06), 946

So. 2d 133; *New South Communications v. Wright,* 35,442 (La. App. 2 Cir. 12/28/01), 803 So. 2d 1103.

**Review of the evidence**

Paxton's testimony is not credible. As a self-styled "government consultant," he testified that he could not figure out how to communicate with the Madison administration after Dr. Topolewski was fired on October 14, 2022, (but he continued submitting invoices for $7,000 each month until February of 2023). Paxton claimed that, notwithstanding this inability to communicate with his client, he continued to do "government consulting" work on behalf of Madison in somehow facilitating Madison's alleged prospective partnership with a behavioral health operator — a partnership that never happened. On January 24, 2023, Guide received a letter from new Madison director, Dr. Donald Perry. This letter informed Guide that Madison would be repudiating the agreement effective immediately, but would reconsider if Guide provided the requested information, *including the services Guide performed for Madison.* However, Guide did not offer Dr. Perry any information regarding the services it allegedly performed for Madison. Instead, Guide, through counsel, sent a demand letter (dated February 21, 2023), threatening to take "legal action" if Madison did not pay Guide $28,000 within seven days of the date of the letter (which, again, offered no description of what Paxton was allegedly doing on behalf of Madison).

Thus, according to Paxton, for at least 3 months (October 14, 2022 through January 2023), he worked as a consultant on behalf of Madison by assisting it with establishment of a partnership with a behavioral health operator *without* Madison even knowing about it. Dr. Topolewski claimed

16

that Paxton had this alleged prospective partnership almost to the contract-drafting phase.  If that were true, it is challenging to imagine why Guide/Paxton responded to Madison's information request with a demand letter threatening a lawsuit.  Likewise, at trial, Guide/Paxton did not attempt to introduce any documentary evidence to support the claim to have been working the alleged prospective partnership almost to the contract-drafting phase.  Paxton offered neither any explanation as to why he failed to do so, nor why Guide failed to call Richardson, the counterparty to the alleged prospective partnership, as a witness.  No reasonable factfinder could believe Paxton's testimony regarding his alleged work after Dr. Topolewski was fired.

Paxton's testimony on other points is likewise unbelievable.  He claimed to have accomplished several great works on behalf of Madison — including obtaining a $38 million loan from the USDA; obtaining a reclassification and higher Medicaid revenue for Madison's rural health clinics; and negotiating with landowners in Madison's land lease for the construction of a new hospital.  However, Paxton admitted he had no documentary evidence whatsoever to support his alleged works because it was all lost during his move back to Louisiana in June 2021.[9]  This explanation is impossible as to the approximate $126,000 in consulting fees Guide/Paxton received *after* the move.  Measured temporally, almost half of the duration of the contract came *after* that move.  Documentation for work done *after* the move could not possibly have been lost *in* the move.

---

[9] That is, other than the brief notations on nine of the invoices.

Additionally, Paxton, by this testimony, implied that he negotiated with the Madison Parish landowners, Sen. Cassidy, the USDA, and the Louisiana Dept. of Heath, and others *without a single text message, email, or phone call sent or received*—in the 2020s. Indeed, emails, text messages, call histories, credit card statements, calendar app data, etc. — at least some of which such activities would have generated — are not corporeal. They are electronic and are stored digitally and/or electronically, often online; if so, they cannot be lost by moving from one place of residence to another. Paxton did not claim that his email server crashed, nor that he lost his phone, nor that his phone was not backed up; nor did he otherwise explain his absolute inability to produce a single electronic document.

Dr. Topolewski's testimony is also untrustworthy. He contradicted and reversed his own testimony multiple times and refused to answer questions to which there was no objection and for which he claimed no privilege. Concerning his instructions — which he gave on October 13, 2022 — to pay Guide's November 2022 invoice, Dr. Topolewski himself "objected" to questions regarding why the invoice was submitted so early and why he approved it so early. Given the context, Dr. Topolewski did this apparently because answering truthfully would make him look bad.

Furthermore, Dr. Topolewski initially insinuated that his initials had been forged on Guide's November 2022 invoice (as approval for payment). However, once opposing counsel showed Dr. Topolewski his own October 13, 2022 email instructing prompt payment of the invoice on November 1, 2022, Dr. Topolewski completely reversed course. He admitted that he approved the payment prematurely and tried to justify it as a virtuous

18

accommodation to Paxton because the latter was to be "out of town."[10]  In simple words, Dr. Topolewski shifted from the equivalent of "I did not do it; my initials were forged," to, once cornered, "Yes, I did it and it was a good thing."  Dr. Topolewski was fired the very next day, and circumstances indicate he knew that his termination was imminent (i.e., he prematurely approved payment of the Guide invoice knowing he would be terminated before the invoice matured).

Furthermore, when asked if he was bitter toward Madison because he was fired, Dr. Topolewski simply refused to answer the question — presumably because he knew answering truthfully would detract from his credibility.

Finally, Dr. Topolewski swore in an affidavit that Madison's legal counsel, Stolier, "reviewed and approved" the contract; however, at trial, he testified that he did not know whether Stolier had even reviewed it.

## SUBSTANTIVE LAW

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. C.C. art. 1906.  "A contract is formed by the consent of the parties established through offer and acceptance." La. C.C. art. 1927.  The irreducible minimum for an enforceable contract consists of the following four elements: (1) at the time of formation of the contract, the parties must possess the *capacity* to contract; (2) the parties must freely give mutual *consent* to the contract, which is established through offer and acceptance;  (3) the contract must

---

[10] From the inception of the agreement in April 2019 until June 2021, Paxton lived in Georgia: he was domiciled "out of town." That did not impede Guide from getting paid for those months. Dr. Topolewski did not offer any explanation as to why Paxton being out of town in November 2022 would impede Guide's receipt of payment.

have an *object* that is lawful, possible, and determinable; and (4) the contract must have a lawful *cause*.[11] La. C.C. arts. 1918, 1927, 1966, 1971; *Granger v. Christus Health Cent. Louisiana*, 12-1892 (La. 6/28/13), 144 So. 3d 736, 760-61. Additionally, a contract confected by an agent on behalf of a principal must be supported by *authority* to so act on behalf of the principal.[12] Our discussion below focuses on the elements of "authority," "object," and "cause."

**Authority**

     **Statutory authority in general.** "A person may represent another person in legal relations as provided by law." La. C.C. art. 2985. The representative is called the "agent" and the represented party is called the "principal." Comment (b) to La. C.C. art. 2985. For purposes of the subject agreement, Madison is the principal and Dr. Topolewski is the agent.

     La. R.S. 46:1057 provides a non-exhaustive list of duties and powers of a hospital director such as Dr. Topolewski; these include:

> (2) With the consent of the commissioners, and subject to such budgetary limitations and any civil service laws in effect, the director shall have power to establish positions and to make appointments thereto; to establish rates of pay; to abolish positions; to transfer duties among positions; to assign duties to, direct and control the work of, and transfer, promote, demote, remove and otherwise change the status of employees of the district.
> …
> (6) To prepare an annual budget for approval by the commission and the police jury.
> …
> (9) To control and direct all business affairs of the district.
> By way of extension and not of limitation, these duties

---

[11] "An obligation may be valid even though its cause is not expressed." La. C.C. art. 1969.

[12] Furthermore, for certain types of contracts, the law imposes form requirements. "Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." La. C.C. art. 1927.

shall include the keeping of the accounts of the district, making necessary purchase of equipment, supplies and materials, making major and minor repairs to physical facilities.

…

(11) To perform any other duties and functions which he or the commission consider necessary or desirable to carry out the purposes of this Chapter.

**Fiscal administration.** At the time the agreement was confected, Madison was under fiscal administration by the state.[13] The fiscal administrator's duties and powers are limited to investigation, monitoring, and proposing a comprehensive budget to the governing authority of the political subdivision. La. R.S. 39:1352. However, if the governing authority refuses to adopt the budget, upon motion by the attorney general, the court:

shall order the adoption and implementation of the budget proposed by the fiscal administrator as revised by the governing authority of the political subdivision, except for those revisions which the court finds will make it reasonably certain that the political subdivision will fail to make timely debt service payments or reasonably certain to fail to have sufficient revenue to pay current expenditures.

La. R.S. 39:1353(B). Thus, it does not follow from the statutory law that a fiscal administrator is the "boss" of a hospital director of a service district hospital under fiscal administration. Instead, the fiscal administrator investigates the finances of the public entity concerned, proposes a budget, and monitors budget compliance.

**Object**

"Parties are free to contract for any object that is lawful, possible, and determined or determinable." La. C.C. art. 1971. "The object of a contract

---

[13] For a fiscal administrator to be appointed, the attorney general must initiate a summary proceeding in the district court and prove by preponderance that the political subdivision lacks financial stability. La. R.S. 39:1351.

21

must be determined at least as to its kind. The quantity of a contractual object may be undetermined, provided it is determinable." La. C.C. art. 1973.

La. C.C. art. 1815 distinguishes divisible and indivisible obligations:

> An obligation is divisible when the object of the performance is susceptible of division.
> An obligation is indivisible when the object of the performance, because of its nature or because of the intent of the parties, is not susceptible of division.

"A contract is commutative when the performance of the obligation of each party is correlative to the performance of the other." La. C.C. art. 1911. "Either party to a commutative contract may refuse to perform his obligation if the other has failed to perform." La. C.C. art. 2022. This article points to the "self-help" right of a party in a commutative contract to refuse to perform if the other party fails to perform his own obligation. If the latter party sues, he has the burden of proving that he *did* perform his own obligation. *Harter, supra.*

Madison's promise to make a monthly, uniform payment of $6,000 or $7,000 per month in consulting fees to Guide indicates that, if the contract was not a simulation (see *infra*), Guide/Paxton would be obligated to — each month — provide services to Madison sufficient to earn those consulting fees. Each month, Dr. Topolewski made a discretionary determination that Paxton had in fact performed, and thus authorized payment of the monthly fee. That determination, however, was based on oral conversation between Topolewski and Paxton. The grounds for Dr. Topolewski's affirmative findings that Paxton had performed were never reduced to writing as such. This "off the books" arrangement made the matter more difficult for Madison commissioners to observe.

22

The fact that the contract remained in effect perpetually, subject to a termination clause, made the overall amount of consulting fees indeterminate at the time the agreement was confected; only the monthly amount is determined. A monthly expense of $6,000 to 7,000 is plausibly less likely to incite inquiry (observation) than, for example, larger amounts paid out as Paxton's alleged projects were completed.

**Cause**

A contract has an onerous cause when the reason that each of the parties enters the agreement is to obtain an advantage in exchange for his obligation. La. C.C. arts. 1909 and 1967. In other words, an onerous contract is one in which the parties are bargaining at arms' length.

Article VII, Section 14(A) of the Louisiana Constitution prohibits the "donation" of government assets. For purposes of government contracts, the policy underlying this constitutional prohibition on donations parallels the policy of the Public Bid Law; the Louisiana Supreme Court has explained that policy as follows:

> [I]nsofar as…[ Public Bid Law] requires advertising and the obtaining of competitive bids, is a prohibitory law founded on public policy. *It was enacted in the interest of the taxpaying citizen and has for its purpose their protection against contracts of public officials entered into because of favoritism and possibly involving exorbitant and extortionate prices*. (Emphasis added.)

*Haughton Elevator Div. v. State, Through Div. of Admin.*, 367 So. 2d 1161, 1164 (La. 1979). Similarly, the Fourth Circuit has stated that the purpose of this constitutional prohibition on such donations "is to protect the electorate from the possibility that a politically powerful individual or interest could importune the legislature or other governmental entity into making a donation of assets of the State." *In re Members of Class of Descendants of*

*Former Owners of Cheniere Ronquillo*, 01-1548 (La. App. 4 Cir. 4/24/02),

817 So. 2d 324, 327, *writ denied*, 02-1448 (La. 9/20/02), 825 So. 2d 1170,

*and writ denied*, 02-1454 (La. 9/20/02), 825 So. 2d 1171.

 *Ronquillo, supra,* explains the policy underlying this constitutional

prohibition with reference only to the donee. Here, using this case as an

example, we add explanation of this constitutional policy with reference to

the "donor." In contrast to a private actor acting in his own individual

capacity, Madison — a government entity funded with tax dollars —

obligated itself to pay Guide $6,000 to $7,000 per month *in perpetuity*

without requiring from Guide any written documentation of the work Guide

allegedly did. In fact, Dr. Topolewski indicated that, *by his design*, Paxton

only kept him abreast of Paxton's alleged work by the spoken word—i.e.,

never in writing.

 The widely discussed "agency problem," i.e., "the ability of

[corporate] directors and officers to shirk their duties and extract private

benefits from corporations with dispersed ownership" must be

acknowledged here. Asaf Eckstein, Gideon Parchomovsky, *The Agent's

Problem*, 70 Duke L.J. 1509, 1511 (2021). Robert H. Sitkoff, *The Economic

Structure of Fiduciary Law*, 91 B.U. L. Rev. 1039, 1040 (2011), explains it

this way:

> The law tends to impose a fiduciary obligation in
> circumstances that present what economists call a
> principal-agent or agency problem…[A]n agency problem
> arises whenever one person, the principal, engages another
> person, the agent, to undertake *imperfectly observable
> discretionary actions* that affect the wealth of the
> principal. The concern is that in exercising this
> *unobservable discretionary authority,* the agent will favor
> the agent's interests when the agent's interests diverge
> from those of the principal. (Emphasis added.)

It would appear that it is far easier to be loose — or even wasteful — with other people's money than one's own, and the problem seems to be magnified in cases like the one before us.

Government corporations, like Madison, are funded by tax dollars from the electorate (as opposed to shareholders who participate voluntarily), and which earn monies ostensibly to serve the electorate. In our constitutional republic, the electorate have no direct say in the awarding of government contracts, nor any broad, individual right of action against government agents who indulge this problematic incentive. Aside from a few narrow exceptions, perhaps the electorate's only remedy is to vote for politicians who vow to root out such conduct — while being mindful that everyone has the same incentive and ability to put their own interests over the interests of those whom they serve. *See Stonecipher v. Caddo Par.*, 51,148 (La. App. 2 Cir. 4/7/17), 219 So. 3d 1187, 1196, *writ denied,* 17-0972 (La. 10/9/17), 227 So. 3d 830.

In light of these underlying policy considerations, we define the term "donation," as used in Article VII, Section 14(A) of the Louisiana Constitution, as any transfer of valuable assets not supported by consideration sufficient to maintain an onerous contract; such consideration must demonstrate that the agreement is the product of an arms' length bargain. Additionally, the government must enforce its obligor's duties in good faith.

Louisiana law disregards inaccurate labels that the parties affix to their agreements. "A contract is a simulation when, by mutual agreement, it does not express the true intent of the parties." La. C.C. art. 2025. A simulation is either relative or absolute. "A simulation is relative when the

parties intend that their contract shall produce effects between them though different from those recited in their contract. A relative simulation produces between the parties the effects they intended if all requirements for those effects have been met." La. C.C. art. 2027. This article presupposes that the contract has a lawful object and a lawful cause and that all other essential elements are established.

Throughout the centuries, our courts have treated donations disguised as onerous contracts *as donations*. For example, in *Austin v. Palmer*, 7 Mart.(n.s.) 20, 21 (La. 1828), 1828 WL 1474, the Louisiana Supreme Court regarded the lender/father's issuance to his debtor/son a receipt for a fictitious loan payment as a donation. In *Seikmann v. Kern*, 132 La. 100, 61 So. 128, 130 (1913), the Louisiana Supreme Court affirmed the trial court's holding that the conveyance in question was a simulation; the higher court noted the clandestinity of the parties' dealings, the conspicuous failure of ostensibly favorable witnesses to testify, and the uncorroborated, self-serving testimony of the parties benefiting from the transaction.

Where an act states consideration which the payor never received, the payment is a simulation, a donation in disguise subject to annulment. *In re Buller's Ests.*, 192 La. 644, 188 So. 728 (La. 1939). However, a "transaction will not be set aside as a simulation if any consideration supports the transaction, because the reality of the conveyance is thus established." *Russell v. Culpepper*, 344 So. 2d 1372, 1376 (La. 1977).

La. C.C. art. 1831 generally allocates the burden of proof regarding contracts in litigation as follows:

> A party who demands performance of an obligation must prove the existence of the obligation.

A party who asserts that an obligation is null, or that it has been modified or extinguished, must prove the facts or acts giving rise to the nullity, modification, or extinction.[14]

However, a rebuttable presumption of simulation may arise:

The burden is initially upon the one alleging…simulation to prove this claim…[However], a jurisprudential presumption of simulation arises when the evidence establishes the existence of facts and circumstances which create a highly reasonable doubt as to the reality of the putative sale. The burden then shifts to the one claiming rights under the putative sale to establish the reality of the sale. This is done by proving a good faith transaction resulting in a true alienation of ownership for consideration. (Internal citations omitted.)

*Hogan*, *supra*. Holding in favor of the party challenging the transaction's validity, *Hogan* found that "the testimony, which fails to show any payment of consideration, creates a 'highly reasonable doubt' as to the reality of the sale. The…[parties supporting the transaction] therefore had the burden of establishing a valid sale or donation inter vivos." *Id*.

Relevant to the inquiry regarding whether there is a "highly reasonable suspicion" of simulation is the adverse presumption rule:

An adverse presumption exists when a party having control of a favorable witness fails to call him or her to testify, even though the presumption is rebuttable and is tempered by the fact that a party need only put on enough evidence to prove the case. Whether to apply such an inference is fully within the discretion of the trial court.[15] (Internal citations omitted.)

---

[14] In 2012, the legislature enacted La. C.C. art. 1849, which in relevant part, states: "In all cases, testimonial or other evidence may be admitted to prove the existence or a presumption of a simulation or to rebut such a presumption.

[15] *Glasscock* further stated: "Louisiana courts have held that the trial judge's decision not to apply the negative inference is not an abuse of discretion under any one of these circumstances: where the witness's testimony would be cumulative; where the party seeking to avail itself of the negative inference has the burden of proof on the issue that would be addressed by the witness's testimony; and where the witness is equally available to the opposing party."

*Glasscock v. Bd. of Sup'rs of La. State Univ.*, 49,855 (La. App. 2 Cir. 8/19/15), 174 So. 3d 757, 760-61, *writ denied*, 15-1628 (La. 10/30/15), 179 So. 3d 618. Application of this principle is illustrated by *Seikmann*, *supra*, wherein the court cited the conspicuous failure of ostensibly favorable witnesses to testify as a fact supporting the finding of simulation.

Furthermore, we hold that, under the circumstances of this case, the same presumption also applies to the failure to create, subpoena, or introduce ostensibly favorable documentary evidence.

## ANALYSIS

### Guide's breach of contract claim

Because the testimony of Paxton and Dr. Topolewski is without credibility, Guide failed to prove the existence of a valid, enforceable contract. For this reason alone, the portion of the judgment awarding Guide $28,000 must be reversed. However, even assuming for the sake of argument that there was an enforceable contract between the parties, the trial court nonetheless committed manifest error in awarding $28,000 to Guide; that is because Guide failed to carry its burden of proof under *Harter*, *supra*, i.e., the burden of proving that Guide performed "government consulting" work for Madison during (any) of the last four months of the contract. The trial court was clearly wrong in concluding that the testimony of Paxton and/or Dr. Topolewski was sufficient to establish prima facie evidence of such performance. Alternatively, the trial court may have committed a legal error in failing to apply *Harter, supra*.

28

**Madison's reconventional demand**

The trial court's holding in favor of Guide on the main demand necessarily precluded Madison's reconventional demand; thus, the trial court dismissed the reconvention with prejudice without further consideration. Our reversal of that holding revives the reconventional demand. Because the record is complete, remand is unnecessary; we conduct de novo determination of the reconventional demand in light of our reversal of the trial court's credibility determinations.

We draw an adverse inference from Guide's failure to subpoena or attempt to introduce any ostensibly favorable third-party witnesses (e.g., Frutiger, the fiscal administrator; Sen. Cassidy; Richardson, the alleged prospective partner/behavioral health operator; the local Madison Parish landowners; or agents of the Louisiana Dept. of Health involved in the alleged Medicaid reclassification), and failure to explain why no such witnesses were called. We draw further adverse inference from Guide's failure to subpoena or introduce any documentary corroboration of Paxton's alleged accomplishments on behalf of Madison, and failure to explain why no such efforts of proof were made. Finally, we draw additional adverse inference based on: (1) Paxton's unbelievable trial testimony, concerning (a) his impossible explanation for his total lack of documentary evidence of what he did for Madison, and (b) his actions after Dr. Topolewski was fired; and (2) Dr. Topolewski's (a) refusal to answer a valid question and his multiple personal "objections" he baselessly raised on cross-examination, (b) his abrupt pivot from insinuating forgery of his initials on the October 13, 2022 invoice, to, once confronted with his own email, saying the equivalent of "Okay, yeah, I did it and it was a good thing," and (c) reversing his initial

29

testimony that Madison's attorney, Stolier, approved the subject contract and admitting he did not know whether Stolier had even reviewed it. Furthermore, given the circumstances, the spreading of the payments to Guide over a perpetual monthly billing cycle, combined with Dr. Topolewski's "off the books" method of determining whether Guide had performed for a given month is consistent with an intention to avoid scrutiny. For these reasons, the totality of the evidence creates a "highly reasonable suspicion" that this was not an arm's length bargain as to Madison's interest.[16]

Below, we detail the grounds for our adverse inferences regarding each alleged work Paxton did for Madison.

*Medicaid reclassification*. Other than agreeing in their testimony, Paxton and Dr. Topolewski did not offer any corroboration of their claims that Paxton expedited a Medicaid reclassification for Madison's rural health clinics—nor even that such reclassification occurred, despite the presumable paperwork involved. It would have been contrary to Madison's interest to introduce such records; conversely, it would have supported Guide's claim to introduce records of the reclassification. As previously stated, Guide made no attempt to subpoena or introduce such documents or the testimony of the decision-makers at the Louisiana Dept. of Health. Furthermore, Dr. Topolewski testified that he did not know any details of what Paxton did in

---

[16] Madison urges us to use analogically La. C.C. art. 1526, which provides a mathematical test for determining whether a purported "donation" is actually an arms' length bargain. The operation of this article is to *validate* certain formally invalid private "donations" which, in substance, are not donations at all, but instead, are onerous contracts. That is, La. C.C. art. 1526 is a shield in the hand of a purported donee, not a sword in the hand of a party to an ostensibly arms' length contractual bargain. We reject Madison's invocation of this article as supplying it a cause of action to recover monies it paid Guide.

allegedly expediting the reclassification for Madison, except that he "went there" and contacted someone.

*USDA loan.*  Likewise, Paxton and Dr. Topolewski did not offer any corroboration of their claim that Paxton obtained Sen. Cassidy's help to get Madison a $38 million loan from the USDA.  It would have supported Guide's claim to introduce records of the loan process or communications with Sen. Cassidy.  Guide made no attempt to subpoena or introduce such documents or the testimony of Sen. Cassidy.

*Negotiation with landowners.*  Furthermore, Guide did nothing to corroborate the claim that Paxton negotiated with local landowners for the lease of land for the new hospital facility (except for notations on the invoices for August, September, and October of 2019, which Paxton wrote).  It would have been contrary to Madison's interest to introduce such records; conversely, it would have supported Guide's claim to introduce records of the leases of the subject land and/or records of Paxton's communications with local landowners.  Guide made no attempt to introduce such documents or the testimony of the landowners.

*Prospective partnership with behavioral health operator.*  Finally, Guide offered no documentation whatsoever demonstrating that Paxton had in fact "worked on" Madison's prospective partnership with Richardson, a behavioral health operator — nor that such partnership ever was an actual prospect.[17]  How such a process could develop all the way to the contract-drafting stage (as Dr. Topolewski alleged) without generating any written language to be included in the contract, written negotiations, other

---

[17] That is, aside from brief notations on a few of the invoices.

paperwork, documents, emails, text messages, etc., is difficult — if not impossible — to imagine. Nor did Guide subpoena or introduce the testimony of Richardson, the alleged prospective partner/behavioral health operator.

The evidence in this case, including Paxton and Dr. Topolewski's unbelievable testimony and the adverse inferences arising from what was not introduced, as outlined herein, creates a "highly reasonable suspicion" that Dr. Topolewski was not dealing at arm's length when he caused Madison to pay $300,620 to Guide for Paxton's alleged services. *Hogan, supra*. Thus, the presumption of simulation applies. For the reasons detailed herein, Guide has failed to rebut that presumption. As a result, the contract has a predominantly unlawful cause and is an absolute nullity. La. C.C. art. 2030; La. C.C. arts. 1966 and 1967; La. Const. art. VII section 14(A).

La. C.C. art. 2033 provides the remedies available when a contract is declared null; in pertinent part, it states:

> An absolutely null contract…is deemed never to have existed. The parties must be restored to the situation that existed before the contract was made. If it is impossible or impracticable to make restoration in kind, it may be made through an award of damages.
>
> Nevertheless, a performance rendered under a contract that is absolutely null because its object or its cause is illicit or immoral may not be recovered by a party who knew or should have known of the defect that makes the contract null. [However,] …[such] performance may be recovered…in exceptional situations when, in the discretion of the court, that recovery would further the interest of justice.

La. C.C. art. 2033. We hold that Guide did prove that it performed services under the contract in connection with its invoices submitted on April 4, 2019, ($7,582); April 30, 2019, ($6,667); August 1, 2019, ($6,677);

September 1, 2019, ($6,618); October 2, 2019, ($7,226); January 1, 2020, ($7,521); February 1, 2020, ($7,488); and April 1, 2021, ($8,563) and is entitled to offset the sum of those amounts against the $300,620 it would otherwise owe Madison.

## CONCLUSION

The judgment of the trial court is **REVERSED**.  Guide's claims against Madison are dismissed with prejudice.  Madison's reconventional demand is granted.  **JUDGMENT** in the amount of $242,278 is hereby awarded in favor of the Madison Parish Hospital Services District and against The Guide Company, LLC.  All costs of this appeal are taxed to The Guide Company, LLC.

**REVERSED; RENDERED.**